OSWALD CARROL *v.* ALLSTATE INSURANCE
COMPANY
(SC 16758)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

*(One justice concurring separately)*

Argued September 26, 2002—officially released February 25, 2003

*Linda L. Morkan*, with who was *Daniel F. Sullivan* and, on the brief, *Thomas J. Donlon*, for the appellant (defendant).

*Frederic S. Ury*, with whom were *Betty Ann Rogers* and, on the brief, *Deborah M. Garskof*, for the appellee (plaintiff).

*Opinion*

VERTEFEUILLE, J. This case arises from a dispute between the plaintiff, Oswald Carrol, and the defendant, Allstate Insurance Company, his property insurance carrier, concerning the origins of a fire at the plaintiff's

home. The defendant appeals[1] from a judgment for the plaintiff rendered after a jury trial, in which the jury awarded the plaintiff damages for intentional and negligent infliction of emotional distress and breach of contract.

The dispositive issues in this appeal are whether: (1) there was sufficient evidence to support the jury's finding that the defendant was liable for intentional infliction of emotional distress; (2) there was sufficient evidence to support the jury's finding that the defendant was liable for negligent infliction of emotional distress; and (3) the $500,000 awarded as compensatory damages was excessive.[2] We affirm the judgment finding the defendant liable for negligent infliction of emotional distress and conclude that the damages awarded on that basis were not excessive.

The jury reasonably could have found the following facts. On January 21, 1997, a fire destroyed a significant portion of the plaintiff's house in Norwalk, which he had owned with his wife for more than twenty years. The evening before the fire, the plaintiff had gone to a local service station to purchase kerosene for use in a kerosene heater. The plaintiff noticed that the container smelled "bad," but nevertheless stored it in the basement of his house. Unbeknownst to the plaintiff, the attendant had filled the container with gasoline instead of kerosene.

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The defendant raised two other issues on appeal: (1) whether the trial court improperly had instructed the jury regarding liability for intentional infliction of emotional distress; and (2) whether the jury's verdict finding liability for intentional infliction of emotional distress was inconsistent with its verdict finding no liability for breach of the covenant of good faith and fair dealing. Because we conclude that the plaintiff did not present sufficient evidence to sustain a finding of liability for intentional infliction of emotional distress, it is not necessary for us to address these two issues.

The next morning, after the plaintiff's wife had left for work, the plaintiff worked on his prayer studies[3] in the basement. While in the basement, he heard a bang, which he thought was his wife returning home. The plaintiff called out to his wife and, after not receiving a response from her, he continued on with his routine, ignoring the banging noise. Later, he smelled something burning and discovered that the kerosene container was on fire. He tried unsuccessfully to extinguish the fire with an old coat; he then picked up the flaming container and threw it out the basement door into his backyard, burning himself in the process. The plaintiff immediately notified his neighbor of the fire and the fire department was then called.

The defendant had issued a homeowner's insurance policy (policy) insuring the plaintiff's home. The policy, which originally was purchased in 1994 and was in effect at the time of the fire, contained standard fire policy provisions insuring the property for its market value. The policy also contained a provision declaring that the defendant would not be liable "for loss occurring . . . while the hazard is increased by any means within the control or knowledge of the insured . . . ."

The plaintiff filed a claim for the fire damage with the defendant. After examining the residence and interviewing the Norwalk fire marshal, the defendant deduced that the fire resulted from arson and initiated an investigation to determine whether the plaintiff had purposefully started the fire.[4] The defendant assigned

---

[3] The plaintiff participated in a church group that studied daily lessons prepared from the Scriptures that was designed to facilitate reflection on religion and its interaction with problems facing modern society. At the end of each week, the group would meet at the church to discuss the lessons.

[4] No criminal charges were filed against the plaintiff in connection with the fire, although the Norwalk fire department had not closed its investigation as of the date of trial.

an investigator from its special investigations unit,[5] Eric Shadbegien, to investigate the fire at the plaintiff's house. The defendant also hired an independent fire expert, Thomas Haynes, to prepare a preliminary report following a more thorough investigation into the possibility of arson. These two investigators conducted interviews, took samples from the premises and examined the fire scene. Both of them concluded that the fire had been the result of arson. The defendant therefore refused to reimburse the plaintiff, in the claimed amount of $26,468, for the plaintiff's personal items such as clothing, furniture, luggage and books. The defendant did pay for the damage to the plaintiff's house and for his wife's portion of the personal property claim. As a result of the defendant's refusal to pay the plaintiff's personal property loss, the plaintiff initiated the action underlying this appeal.[6]

The jury found that the defendant had breached the insurance contract[7] and that the defendant was liable for both intentional and negligent infliction of emotional distress. The jury awarded the plaintiff $500,000 in compensatory damages and the trial court awarded the plaintiff $60,000 in punitive damages because of the jury's finding that the defendant intentionally had inflicted emotional distress on the plaintiff. The defendant moved to set aside the verdict, to reduce the verdict, and for judgment notwithstanding the verdict. His motions, however, were denied by the trial court. This appeal followed. Additional facts will be set forth as necessary.

[5] The special investigations unit researches claims that the defendant considers suspicious, requiring more in-depth investigations, such as burglaries, stolen motor vehicles, and fires.

[6] The defendant filed a counterclaim asserting that the plaintiff had caused the defendant to incur unnecessary costs by committing arson. We do not address this claim because it is not at issue on appeal.

[7] The defendant has not challenged the breach of contract finding on appeal.

## I

The defendant first claims that the plaintiff did not present sufficient evidence to establish the defendant's liability for intentional infliction of emotional distress. Specifically, the defendant maintains that the plaintiff failed to prove one of the required elements of the cause of action, namely that the defendant's actions were extreme and outrageous. The plaintiff responds that there was sufficient evidence to prove that the plaintiff had suffered emotional distress as a result of the defendant's extreme and outrageous conduct. We agree with the defendant.

The jury reasonably could have found the following additional facts concerning the defendant's actions. At trial, the plaintiff called as a witness John Barracato, an independent, neutral fire loss expert, who testified that the fire at the plaintiff's house was accidental and not the result of arson. For trial, Barracato prepared a full and final structural fire investigation report.[8]

In the report, Barracato concluded that the fire had been started by liquid vapors from the kerosene container in the basement. According to Barracato, the substance purchased by the plaintiff the night before the fire was, in fact, gasoline and when the plaintiff placed the container in the basement, vapors began to leak toward the source of ignition, the pilot light of a stove located in the basement. Barracato also found that irregular, radiated heat burns were located all over the basement floor, a finding consistent with the combination of a vapor fire and the type of synthetic carpeting located in the plaintiff's house.

---

[8] It is evident that the jury credited Barracato's testimony and report because the jury found that the defendant had breached the insurance contract by not compensating the plaintiff for his personal property loss. Thus, the jury necessarily must have found that the plaintiff had not intentionally started the fire.

Barracato concluded in his report: "This investigator saw no indicators of an intentional act relative to this incident. . . . The bottoms of cabinets, constructed of wood paneling, showed no signs of flame impingement damage. Had flammable liquids been splashed around this basement, all of the cabinets, refrigerator, kitchen table and chairs, sewing machine, wheels on the secretary chair, the cloth covered couch and love seat, and a five gallon can of kerosene would have been seriously fire damaged by direct flame impingement. This was clearly not the case."

Barracato's conclusion that arson was not involved was based on a number of other factors that pointed toward an accidental fire. First, the time of the fire at the plaintiff's house, 11:30 a.m., was not typical of arson. Barracato noted that arsonists usually set fires between midnight and 6 a.m. to reduce the possibility of discovery and to assure total destruction for maximum insurance claim recovery. Second, he noted in his testimony that the plaintiff was home during the fire, that he was badly burned trying to remove the flaming container from the house, and that he was the one who informed a neighbor to call the fire department. Further, no valuables had been removed from the house prior to the fire and the plaintiff's cars and truck were still parked adjacent to the house. All of these factors indicated to Barracato that this was not a case of arson because the plaintiff's actions did not indicate that he was trying to hide the fire or maximize the destruction of his house.

Both in his report and in his testimony at trial, Barracato was critical of the investigation and report prepared by Haynes and Shadbegien, opining that their investigation and report had not been thorough and, as a result, were not accurate. Barracato testified that these investigators for the defendant had ignored vital evidence that was needed to prepare a complete report. For example, he testified that Haynes' report did not

take into account a number of the factors Barracato had testified about, such as the time of the fire, the injuries to the plaintiff and the location of the plaintiff's cars, all of which were supportive of an accidental fire.

Also, the defendant's investigation relied heavily on the burn patterns on the floor, and it concluded that the patterns indicated arson. Barracato criticized the manner in which Shadbegien and Haynes had examined the burn patterns. In his report, Barracato stated: "Other investigators, public and private, did not clear away the drop down debris from the floor. [During the fire, the ceiling had flaked and fallen to the floor.] As a result, they could not be in a position to see if there were intentional pour patterns. This investigator did not observe pour patterns on the carpeting. There was only superficial radiated heat patterns as one would expect to see." Barracato testified that the defendant's investigators failed to move objects in the basement in order to observe the burn patterns more accurately. Barracato testified that had some of the furniture been moved, it would have become evident to the investigators that the burn patterns indicated a vapor fire.

The jury could also have found that the defendant's fire investigation was neither thorough nor neutral.[9] Shadbegien testified that he did not believe a number of the factors pointing to an accidental fire that Barracato had testified were relevant to the investigation and therefore did not take them into account. Shadbegien also failed to provide Haynes with the information necessary to complete a final and reasoned report. Haynes' report never identified an ignition source for the fire, and Shadbegien reached a preliminary conclusion that arson was involved only weeks after the fire, before he

---

[9] The plaintiff's theme throughout the trial was that the defendant, after little investigation, rashly had concluded that the fire was caused by arson and that the defendant never reexamined this conclusion despite the existence of substantial evidence to the contrary.

possessed most of the evidence. Haynes never inspected the stove in the plaintiff's basement, which Barracato had identified as the source of the fire. Haynes' report was only preliminary, yet Shadbegien decided he did not need a more thorough or final report because he was persuaded that the plaintiff had committed arson.

During the trial, the plaintiff presented evidence that Shadbegien's determination that the fire was arson was impulsive and might have been influenced in part by the fact that the plaintiff was African-American. Only days after the fire, the plaintiff had overheard a conversation between Shadbegien and another one of the defendant's agents. The plaintiff testified regarding that conversation as follows: "The conversation was about the beams in the basement. And, this gentleman [one of the defendant's agents] asked Mr. Shadbegien who is the owner of the house. And, Mr. Shadbegien replied, [t]he black guy, Mr. Carrol. And, then [Shadbegien] says, '*[t]he son of a bitch is mine.*' " (Emphasis added.) Shadbegien also asked questions during interviews with the plaintiff that the plaintiff found offensive, for example, insinuating that the plaintiff had obtained his motor vehicles through questionable activity. The plaintiff testified that Shadbegien consistently made him feel like a criminal. The jury also could have inferred from Shadbegien's testimony that Haynes had a tendency to find arson as the cause of suspicious fires and to ignore facts counter to the conclusion of arson, so that the defendant would continue to employ Haynes frequently.

Finally, the defendant made numerous requests for information from the plaintiff, which, at times, bordered on harassment. The plaintiff frequently was asked to allow his house to be inspected, and he was interviewed multiple times. The plaintiff, nevertheless, timely complied with all of the defendant's requests.

The standards governing our review of a sufficiency of evidence claim are well established and rigorous. *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 533–34, 733 A.2d 197 (1999); *Purzycki* v. *Fairfield*, 244 Conn. 101, 112–13, 708 A.2d 937 (1998). "[I]t is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Citations omitted; internal quotation marks omitted.) *Ormsby* v. *Frankel*, 255 Conn. 670, 692, 768 A.2d 441 (2001).

"We apply this familiar and deferential scope of review, however, in light of the equally familiar principle that the plaintiff must produce sufficient evidence to remove the jury's function of examining inferences and finding facts from the realm of speculation." *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 17–18, 734 A.2d 85 (1999). A motion to set aside the verdict should be granted if the jury reasonably and legally could not have reached the determination that they did in fact reach. *Craine* v. *Trinity College*, 259 Conn. 625, 636, 791 A.2d 518 (2002). If the jury, without conjecture, could not have found a required element of the cause of action, it cannot withstand a motion to set aside the verdict. See id.

We recently reviewed the elements of a cause of action for intentional infliction of emotional distress in *Appleton* v. *Board of Education*, 254 Conn. 205, 757 A.2d 1059 (2000). "In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction

of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct;[10] (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . *Petyan* v. *Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986)." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, supra, 210.

"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society . . . . *Petyan* v. *Ellis*, supra, 200 Conn. 254 n.5, quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 12, p. 60. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous! 1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965). Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress. *Mellaly* v. *Eastman Kodak Co.*, 42 Conn. Sup. 17, 19, 597 A.2d 846 (1991)." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, supra, 254 Conn. 210–11.

In the present case, the evidence was not sufficient for a jury reasonably to conclude that the defendant's

---

[10] The defendant challenged the "knew or should have known" standard; however, we do not find it necessary to address this argument.

conduct in its fire investigation was extreme and outrageous. The plaintiff produced evidence that the defendant did not conduct a thorough or reasoned investigation and may have decided too quickly that the fire had been set deliberately. As distressing as this insurance investigation may have been to the plaintiff, however, it simply was not so atrocious as to trigger liability for *intentional* infliction of emotional distress.

As a result of the jury's finding of intentional infliction of emotional distress, the trial court awarded the plaintiff $60,000 in punitive damages. On the basis of our conclusion that the evidence was not sufficient to support the jury's finding, we conclude that the trial court improperly denied the defendant's motion to set aside the verdict on this claim. Accordingly, the trial court's award of punitive damages based on the jury's finding of intentional infliction of emotional distress must be vacated.

## II

The defendant next claims that the plaintiff failed to prove that the defendant *negligently* inflicted emotional distress on the plaintiff. The defendant contends that there was insufficient evidence to prove the following elements of the cause of action for negligent infliction of emotional distress: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. The plaintiff contends that there was sufficient evidence for the jury reasonably to reach its verdict, and, therefore, the jury's verdict should be upheld. We agree with the plaintiff.

As set forth in part I of this opinion, the jury reasonably could have found that the defendant's arson investi-

gation had been hasty, incomplete and ill-reasoned. Further, the jury could have found that the defendant's investigation was improperly motivated in that Haynes was motivated to find arson in order to ensure his continued employment by the defendant. In addition, the plaintiff's testimony that he had been referred to as a black man and a "son of a bitch" could have led the jury to find that the plaintiff's race might have played a role in the defendant's conclusion of arson.[11]

The jury reasonably could have found further that the defendant's investigation into the cause of the fire caused the plaintiff severe emotional distress. The plaintiff testified about the impact of the investigation as follows: "This affected me mentally, socially and physically. It was, the fire in itself [was], a disaster. But for [the defendant] to come along and accuse me of wrongdoing in this fire, that was devastating to me personally. I went to bed and I couldn't sleep. I had nightmares. I thought my life was just—had just unraveled before my very eyes. In our entire lives, that is, [my wife] and I, we have never been accused, we have never been engaged in any such activities, any such behavior. And this truly hurt me physically. It was a greater loss to me at the time than the material things." The plaintiff further testified that he experienced a loss of appetite, and that he became extremely depressed. The plaintiff's despondent nature also caused marital discord between the plaintiff and his wife. Ultimately, since the plaintiff could not afford to pay the mortgage

---

[11] Further, counsel for the plaintiff alluded to the possibility of racial bias during closing arguments: "I think that they made up their mind day one. I think Mr. Shadbegien, for whatever reason, showed up at this house. And, he took one look at [the plaintiff]. He took one look at these cars in the driveway and the truck in the driveway. And, took one look at the inside of this house, and for whatever reason—and I'll let you all think about that—he concluded that this man tried to burn his house down. And, then he spent the rest of the time trying to make sure it could stick."

on his house while simultaneously paying for temporary housing, he was forced to live out of his truck.

The accusations of wrongdoing also greatly impacted the plaintiff's relationship with those in his community. He testified: "[F]or your neighbors to hear that you have been accused of this type of wrongdoing, the people looking at you with some kind of suspicion and doubt, it was terrible. . . . It is excruciatingly painful. We have been through three and a half years of hell. That's what we [have] been through." The effects of accusations of arson were more acute for the plaintiff because he was a devoutly religious man who was very active in his church. Although the plaintiff's church congregation was supportive throughout his ordeal, the plaintiff nevertheless suffered additional humiliation at the prospect that fellow members of his congregation might have considered him a criminal.

We previously recited the standard of review for a sufficiency of the evidence claim in part I of this opinion. We accord great deference to the jury's determination and do not disturb verdicts if, viewing the evidence in the light most favorable to sustaining the verdict, the jury reasonably could have reached its conclusion. *Gaudio* v. *Griffin Health Services Corp.*, supra, 249 Conn. 534.

In *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978), this court for the first time recognized a cause of action for negligent infliction of emotional distress. We continually have held that "in order to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) *Scanlon* v. *Connecticut Light & Power*

*Co.*, 258 Conn. 436, 446, 782 A.2d 87 (2001). In *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 261–62, 654 A.2d 748 (1995), we further reasoned: "This part of the *Montinieri* test essentially requires that the fear or distress experienced by the plaintiffs be reasonable in light of the conduct of the defendants. If such a fear were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be held liable. Conversely, if the fear were unreasonable in light of the defendants' conduct, the defendants would not have recognized that their conduct could cause this distress and, therefore, they would not be liable."

We disagree with the defendant's claim that the plaintiff did not prove any of the elements required for negligent infliction of emotional distress. There was sufficient evidence for the jury reasonably to have concluded as it did. Under the standard set forth in *Barrett* v. *Danbury Hospital*, supra, 232 Conn. 261–62, there was sufficient evidence that the plaintiff's distress was reasonable in light of the defendant's conduct.[12] The defendant conducted an arson investigation to establish whether the plaintiff had engaged in conduct that was *criminal*. Moreover, there was evidence from which the jury could have inferred that the defendant's investigation was not only shoddy, but that it possibly was influenced by racial sterotypes. We conclude that there

---

[12] In its brief to this court, the defendant relied on *Safeco Ins. Co. of America* v. *Costello*, 799 F.2d 412 (8th Cir. 1986), a Missouri case, to establish that the plaintiff failed to prove that the defendant's conduct unreasonably risked causing distress. That case does not control the present case, because the requirements to establish negligent infliction of emotional distress in Missouri are different from the requirements in our jurisdiction. In Missouri, in order to establish that a defendant should have realized its conduct involved an unreasonable risk of causing emotional distress, the plaintiff must prove, "that the distress or injury was medically diagnosable and of sufficient severity to be medically significant." Id., 414.

was sufficient evidence to support a finding that the defendant's conduct created an unreasonable risk of causing the plaintiff's emotional distress and that the plaintiff's distress was foreseeable.

In addition, there was sufficient evidence that the plaintiff's distress was severe enough for the jury reasonably to conclude that the plaintiff's distress might result in illness or bodily harm. "This court . . . in *Montinieri* v. *Southern New England Telephone Co.*, [supra, 175 Conn. 344], concluded that there is no logical reason for making a distinction, for purposes of determining liability, between those cases where the emotional distress results in bodily injury and those cases where there is emotional distress only." (Internal quotation marks omitted.) *Maloney* v. *Conroy*, 208 Conn. 392, 398, 545 A.2d 1059 (1988). The only requirement is that the distress *might* result in illness or bodily harm. The plaintiff testified that he could not sleep, had frequent nightmares, had a loss of appetite, and experienced depression and a sense of isolation from his community because of the investigation.

Finally, there was sufficient evidence from which the jury could find causation. The plaintiff testified that although the fire was upsetting, it was the defendant's investigation that was "devastating" and the cause of his emotional turmoil.

### III

The defendant's final claim is that the award of $500,000 in compensatory damages was excessive as a matter of law "in light of the very limited evidence of distress, and in comparison to the economic damages of $26,468.38." The defendant claims that the trial court improperly denied the defendant's motions to set aside the verdict and to reduce the verdict and that the court should have ordered a remittitur. The plaintiff contends in response that the damages awarded were just, and

that the trial court did not abuse its discretion in refusing to set aside the verdict. We agree with the plaintiff.

The trial court denied the defendant's motions, finding that the verdict did not shock the court's conscience. The court found that the jury "could reasonably have reached this verdict and the amount found. The amount falls within the necessarily uncertain limits of fair and reasonable damages."

Our scope of review of an award of damages is well settled. "We accord great deference to a jury's award of damages. Litigants have a constitutional right to have factual issues determined by the jury. This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . This right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court. . . . The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . In considering a motion to set aside the verdict, the court must determine whether the evidence, viewed in the light most favorable to the prevailing party, reasonably supports the jury's verdict." (Citations omitted; internal quotation marks omitted.) *Childs* v. *Bainer*, 235 Conn. 107, 112–13, 663 A.2d 398 (1995).

"In reviewing the action of the trial court in denying the [motion] . . . to set aside the verdict, our primary concern is to determine whether the court abused its discretion . . . . The trial court's decision is significant because the trial judge has had the same opportunity as the jury to view the witnesses, to assess their

credibility and to determine the weight that should be given to their evidence. Moreover, the trial judge can gauge the tenor of the trial, as we, on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury. . . . Our task is to determine whether the total damages awarded falls somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case . . . or whether the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, mistake or corruption." (Citations omitted; internal quotation marks omitted.) Id., 113–14.

"The jury had the right to accept whatever portion of the evidence it chose and consider it in its calculations." *Mather* v. *Griffin Hospital*, 207 Conn. 125, 149, 540 A.2d 666 (1988). In the present case, the jury reasonably could have found that the defendant abused its right to investigate the origin of the fire at the plaintiff's house by conducting an investigation that was hasty, incomplete and ill-reasoned, thereby causing emotional distress to the plaintiff. Moreover, the jury could have found that in conducting the investigation, the defendant had improper motivations. The trial court clearly was in the best position to judge the tenor of the trial. See *Childs* v. *Bainer*, supra, 235 Conn. 113. We cannot conclude that the trial court abused its discretion in denying the defendant's motions to set aside or reduce the verdict or to render judgment notwithstanding the verdict.[13]

---

[13] The verdict form given to the jury in this case instructed it to find one amount of damages if the jury found the defendant liable for either intentional infliction of emotional distress or negligent infliction of emotional distress, or both. During oral argument before this court, the defendant conceded that it had agreed to the verdict form and accepted a general award for all claims involving emotional distress liability. Nonetheless, the defendant suggested in response to questions from this court, that the elements of the causes of action for both intentional infliction of emotional distress and negligent infliction of emotional distress should be the same.

The judgment is reversed only with respect to the finding of intentional infliction of emotional distress and the case is remanded with direction to vacate the award of punitive damages on that count; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

BORDEN, J., concurring. I agree with and join the majority opinion. I write separately only to highlight what seems to me to be an anomaly in our law regarding the difference between the "conduct" element of the twin torts of intentional infliction of emotional distress and negligent infliction of emotional distress. Because this issue was not raised in the trial court or in either party's brief in this court, however; see footnote 13 of the majority opinion; this appeal does not properly present it. I raise it, nonetheless, so that it might be considered in some future case.

In order to establish the tort of intentional infliction of emotional distress, the plaintiff must prove that the defendant's conduct was "extreme and outrageous." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000); *Petyan* v. *Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986). In order to establish the tort of negligent infliction of emotional distress, the plaintiff must prove that the defendant's conduct "involved an unreasonable risk of causing emotional distress . . . that . . . might result in illness or bodily harm." (Internal quotation marks omitted.) *Scanlon* v. *Connecticut Light & Power Co.*, 258 Conn. 436, 446, 782 A.2d 87 (2001); *Montinieri* v.

Consequently, the defendant claimed, if we were to reverse the trial court's decision on either of the emotional distress claims, we should reverse the damages award as well. We disagree, because the defendant did not raise this claim in the trial court or in this court until oral argument. Therefore, we see no reason to depart from our normal practice of deciding an appeal on the same basis on which it was tried in the trial court. See *State* v. *Bell*, 188 Conn. 406, 413, 450 A.2d 356 (1982).

*Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978). Thus, it seems apparent to me that, with respect to proof of the defendant's tortious conduct, the plaintiff has a more difficult burden when the defendant's state of mind is intentional, rather than negligent. Put another way, where the defendant's state of mind is purposefully to inflict emotional distress on the plaintiff, the plaintiff may not recover unless the defendant's conduct in pursuance of that intent is also extreme and outrageous; but where the defendant did not have such a malevolent state of mind, but merely was negligent, the plaintiff may recover without having to prove that the conduct engaged in by the defendant was extreme and outrageous.

This means, it seems to me, that the more culpable the defendant's state of mind, the more difficult the plaintiff's burden of persuasion will be on the conduct element of the tort, and, therefore, the less likely it is that the defendant will be held liable. By contrast, the less culpable the defendant's state of mind, the less difficult the plaintiff's burden of persuasion will be on the conduct element of the tort, and, therefore, the more likely it is that the defendant will be held liable. This result strikes me as anomalous.

I do not know how or why our law regarding these two torts has developed as it has. There may be a rational explanation. Perhaps some future case will present us with the opportunity to explore and resolve this apparent anomaly.