Robert STORM, Plaintiff,

v.

ITW INSERT MOLDED PRODUCTS, A DIVISION OF ILLINOIS TOOL WORKS, INC., Defendant.

No. 3:05cv24 (JBA).

United States District Court, D. Connecticut.

Jan. 10, 2007.

Maureen E. Donahue, Torrington, CT, for Plaintiff.

Bernard E. Jacques, Pepe & Hazard, Hartford, CT, for Defendant.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 31]

ARTERTON, District Judge.

Plaintiff Robert Storm initiated this action against his former employer, ITW Insert Molded Products, a Division of Illinois Tool Works, Inc. ("ITW"), following his termination from ITW, alleging wrongful discharge in violation of public policy and intentional and negligent infliction of emotional distress. Amended Complaint [Doc. # 12]. ITW removed the case to federal court on the basis of diversity jurisdiction and subsequently moved to dismiss the Amended Complaint, which motion was granted as to plaintiff's wrongful discharge claim and denied as to plaintiff's infliction of emotional distress claims. *See* Mot. to Dismiss Ruling [Doc. # 25]. Defendant now moves for summary judgment on those two remaining claims. Mot. for Summ. Judgment [Doc. # 31]. For the reasons that follow, defendant's motion will be granted as to the intentional infliction claim and denied as to the negligent infliction claim.

### I. Factual Background

Plaintiff was hired by ITW's predecessor in 1970 and continued to work there in various capacities until his termination effective April 28, 2003. Plaintiff had received positive performance reviews and

defendant does not claim that he was terminated due to any performance-related issues. Rather, defendant contends that plaintiff was terminated as the result of economic concerns. According to defendant, in December 2002 a budget calling for the elimination of three of the 74 positions at defendant's Lakeville facility, including plaintiff's position, was approved. Thurston Aff. [Doc. # 34, Ex. 1] ¶¶ 4–6; Holtz Aff. [Doc. # 34, Ex. 2] ¶ 4. Defendant claims that the Lakeville Operations Manager, William Thurston, and defendant's human resources representative for the Lakeville Facility, Susan Holtz, decided to eliminate the positions during the first week of January 2003. Thurston Aff. ¶¶ 7–9; Holtz Aff. ¶¶ 5–6.

On December 25, 2002, Thurston received a call from plaintiff's wife, Dianne Storm, informing him that plaintiff had been hospitalized as a result of a problem with his heart, that the situation was serious, and that at that time plaintiff had no return-to-work date. Thurston Aff. ¶ 10; Storm Dep. [Doc. # 34, Ex. 4; Doc. # 40, Ex. C] at 11–12; D. Storm Aff. [Doc. # 40, Ex. B] ¶ 3. Sometime between Christmas and New Year's Day, Holtz also learned that plaintiff had medical problems and had been hospitalized, and she and Thurston "agreed that it would be a mistake to go forward with eliminating the positions while plaintiff's status was unknown." Holtz Aff. ¶ 7; Thurston Aff. ¶ 11 ("Ms. Holtz and I agreed that given the size of the workforce at the Lakeville facility, it would be a mistake to inform two of three affected employees of the position eliminations."). Holtz and Thurston determined that they wanted to announce the position eliminations at one time in order to be able to tell remaining employees that no other eliminations were planned and to prevent the spread of rumors before they could meet with all three individuals whose positions were being eliminated. Thurston Aff. ¶¶ 11–12; Holtz Aff. ¶¶ 8–9.

On December 31, 2002, Dianne Storm hand-delivered a medical note to ITW from Dr. Spath indicating that plaintiff had to stay home until he was seen by Drs. Cohen and Lassman the following week. See 12/31/02 Note [Doc. # 34, Ex. 6]; D. Storm Aff. ¶ 4; Thurston Aff. ¶ 13; Holtz ¶ 11. Plaintiff testified that during this time period, every time he saw a doctor, he either returned with a note that he would provide to ITW or would call or email an ITW representative to provide an update. Storm Dep. at 14; Storm Aff. ¶ 14; accord D. Storm Aff. ¶ 5 (over the several weeks following December 31, 2002, Ms. Storm "was in contact with ITW to keep them updated on [her] husband's medical conditions"). Specifically, "after the series of testing done by Dr. Lassman on January 14th, [plaintiff] recall[s] communicating with either of [Thurston or Laverty (another ITW representative)] the fact of the testing being done and the possibility of a tumor on or near [his] adrenal gland." Storm Aff. ¶ 18. Plaintiff stated that as of January 16, 2003, his medical condition was still undiagnosed, id. ¶ 19, although he also testified that as of January 14, he believed he could return to work on January 27. Storm Dep. 125–26. It was not until February 13, 2002 that Dr. Lassman gave plaintiff the definitive testing results and told him that the tumor needed to be removed. Storm Dep. at 37. Thurston testified that on January 13, 2003, he received a note from Dr. Cohen stating that plaintiff could return to work on January 27 without restrictions, see 1/14/03 Notes [Doc. # 34, Exs. 7,8], that the note was the only information he had about plaintiff's condition at the time,[1] and that he and

---

1. Plaintiff and his wife both testified that at
no time from December 25, 2002 forward did

Holtz decided to inform the affected employees of the position eliminations on January 16. Thurston Aff. ¶¶ 14–15; *accord* Holtz Aff. ¶¶ 12–13.

Thus, on the morning of January 16, 2003, after Thurston and Holtz had informed the two other employees that their positions had been eliminated, Thurston contacted plaintiff and asked him to come down to the Lakeville facility; Thurston did not tell plaintiff why he was needed and plaintiff did not inform Thurston that he was too ill to go because "ITW and their previous owners had been [his] life for [his] adult work life, and [he] felt [he] needed to go." Storm Dep. at 35, 38. According to plaintiff, when Thurston told him that his position was being eliminated, plaintiff "broke down" and "got up and walked around Bill's [Thurston's] office;" Thurston told plaintiff that the position was being eliminated due to financial constraints, was not a reflection on plaintiff's work, and not to take it personally. Storm Dep. at 41. Plaintiff testified that he then began having "one of [his] undiagnosed medical problems," which he called a "speed up," lasting about five to eight minutes. Storm Dep. at 42–45. Plaintiff sat down in the chair next to Thurston's desk and asked for a glass of water, which Thurston gave him, and told Thurston and Holtz how he was feeling and that he was having a "speed up." *Id.* Plaintiff did not remember whether he had previously used the term "speed up" with Thurston, but he believed Thurston was aware that plaintiff used that term. *Id.* Dianne Storm described plaintiff's "spells": "he would start to sweat. He would get pale. He would be nervous—his nerves would be—his hands would shake sometimes. He had—he would hold his head—there were times when he was holding his—he would rub his—rub his left arm and he—there were times when he—he would be nauseous from it." D. Storm Dep. at 10. Thurston testified that he had worked with plaintiff for a long time and knew him to sometimes have anxiety attacks which would necessitate plaintiff's leaving work. Thurston and Holtz both stated that upon giving plaintiff the news, he was teary-eyed and appeared "upset," and they confirm that plaintiff asked for a glass of water, which Thurston provided. Thurston Aff. ¶ 21; Holtz Aff. ¶ 18–21. Thurston and Holtz also testified, however, that "[a]lthough plaintiff was visibly upset during this meeting, he did not appear more upset than [Thurston] would have expected from someone learning that his or her position had been eliminated" and that "[plaintiff's] reaction upon being told that his job had been eliminated did not appear extreme or unwarranted." Thurston Aff. ¶ 24; Holtz Aff. ¶ 19.

Plaintiff testified that upon the onset of his "spell," he requested that his wife be allowed to participate in the meeting, Thurston and Holtz agreed, and plaintiff telephoned his wife. Storm Dep. at 46; D. Storm Dep. at 17; Thurston Aff. ¶ 25; Holtz Aff. ¶¶ 22–24. Ms. Storm testified that when she arrived at ITW, plaintiff was crying, was having a "spell," "was very upset," "was crying or he had been," and was "under a lot—a lot of strain—with the worrying about his physical condition, not knowing what—at that point, what was actually wrong with him . . . this was a psychological blow that he was having a hard time dealing with." D. Storm Dep. at 9, 21. Neither plaintiff nor his wife asked Thurston and/or Holtz to stop or delay the meeting because they had not called the meeting and did not believe they could

anyone at ITW ask for additional medical information regarding plaintiff's condition.

Storm Aff. ¶ 13; D. Storm Aff. ¶ 6.

stop it. Storm Dep. at 45–46, 101, 111; D. Storm Aff. ¶ 7.

Thurston testified that ITW planned to keep the plaintiff employed while he was on his medical leave of absence, Thurston Aff. ¶ 17, and Holtz stated that in preparing the benefits/severance paperwork for plaintiff, she had to plug in a termination date, and therefore she chose January 17, 2003 (the next day following the meeting), "knowing that [plaintiff's] last day would be after that day but at least [she] could provide plaintiff with a reasonable estimate of his benefits [and] could explain to him that his benefits would be at least what they would have been on January 17," Holtz Aff. ¶ 15. Like Thurston, Holtz testified that she "knew that plaintiff was on a medical leave of absence and that he would not be terminated until that leave was over." *Id.* By contrast, plaintiff and his wife testified that Thurston and Holtz did not indicate that the effective date of termination would be after plaintiff was released from medical care, that the documents provided stated an effective termination date of January 17, and that it was only after plaintiff refused to sign any paperwork listing a January 17 termination date that "it was decided" that plaintiff would not be terminated until he was released from medical care. Storm Dep. at 42, 48–49; Storm Aff. ¶¶ 16–17; D. Storm Dep. at 32–33; D. Storm Aff. ¶¶ 8–9. Eventually the meeting concluded, Thurston assisted plaintiff in collecting items from his desk, and plaintiff and his wife drove home in their respective cars.

On February 4, 2003 plaintiff emailed ITW representatives, including Thurston and Holtz, informing them that he was scheduled for an operation in March and that a new doctor's note said that he should be out from December 24 "until further notice" and that Dianne would be bringing the note to Lakeville the next day. 2/4/03 Email [Doc. # 34, Ex. 13]; Lassman Note [Doc. # 34, Ex. 14]; Thurston Aff. ¶ 30. Plaintiff provided another update as to his condition on February 21, 2003. 2/21/03 Email [Doc. # 34, Ex. 15]. Plaintiff's tumor was successfully removed in March 2003 and he was ultimately terminated officially on April 28, 2003 after being cleared to return to work. Thurston Aff. ¶ 33; Holtz Aff. ¶ 31.

Plaintiff did not seek medical treatment on January 16, 2003 to tell a doctor what happened or to consult with a doctor about his need to get his stress level down as a result of what happened. Storm Dep. at 58–59. When asked whether he ever sought medical treatment because of what happened on January 16, 2003, plaintiff responded that "[d]uring [his] next visit to the psychiatrist [they] discussed the events" and he "might have discussed it with [his] PCP [primary care physician]." *Id.* at 59. His psychiatrist did not change his medication or schedule him for additional appointments, and plaintiff thought he was "handling it okay." *Id.* at 60, 75. Dianne Storm stated that "[t]he effects of the loss of job on [her] husband were serious. He went through several periods of depression, sadness, feelings of loss of confidence, feelings of loss of ability to support himself and our family, and feelings of humiliation and embarrassment." D. Storm Aff. ¶ 10. Plaintiff similarly testified that he suffered mental anguish because his pay was cut more than in half and he can no longer be in touch with his ITW former colleagues. Storm Dep. at 97. Plaintiff's psychiatrist, Dr. Charles Mirabile, testified that when he saw plaintiff on February 18, 2003, plaintiff told Mirabile that he was "taking his termination at work in stride," and Mirabile did not make any change in plaintiff's medication from February 18, 2003 forward. Mirabile Dep. [Doc. # 34, Ex. 10] at 18; 2/18/03 Notes [Doc. # 34, Ex. 11]. After an appointment

with plaintiff on May 3, 2003, Dr. Mirabile wrote that plaintiff was "in good spirits, keeping busy, does not have a job." 5/3/03 Notes [Doc. # 34, Ex. 11]. Dr. Mirabile's notes from a September 8, 2003 appointment also reported plaintiff "doing extremely well. essentially no complaint," and his December 2, 2003 notes indicate that plaintiff was "still not working & liking it." 9/8/03, 12/2/03 Notes [Doc. # 34, Ex. 11].

## II. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of N. Y.*, 72 F.3d 1051, 1060 (2d Cir.1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Id.* (citations omitted). "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir.1997) (internal quotation, cita-

tion, and alteration omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir.2001) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548); *see also Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). In making this determination, the Court draws all reasonable inferences in the light most

favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed.R.Civ.P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348 (citations omitted).

## III. Discussion

### A. *Intentional Infliction of Emotional Distress*

■ In order to succeed on a claim of intentional infliction of emotional distress, a plaintiff must prove: (1) that defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of its conduct; (2) that the conduct was extreme and outrageous; (3) that defendant's conduct was the cause of plaintiff's distress; and (4) that the emotional distress sustained by plaintiff was severe. *See Appleton v. Bd. of Educ. of the Town of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059 (Conn.2000).

■ Whether defendant's alleged conduct was sufficiently "extreme and outrageous" for plaintiff to succeed on a claim for intentional infliction of emotional distress is a question for the Court in the first instance and only "where reasonable minds disagree" will it become an issue for the jury. *See Appleton v. Bd. of Educ. of the Town of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059 (Conn.2000). The Connecticut Supreme Court has articulated the standard for "extreme and outrageous" conduct as follows:

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ... Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress.

*Id.* at 210–11, 757 A.2d 1059. Courts have held that "[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." *Parsons v. United Techs. Corp.*, 243 Conn. 66, 89, 700 A.2d 655 (Conn.1997).

As to the first element of intent, there is evidence in the record from which a jury could reasonably conclude that defendant knew or should have known that emotional distress was the likely result of its conduct. Both plaintiff and Thurston testified to the fact that Thurston knew that plaintiff occasionally had anxiety attacks severe enough to necessitate his leaving work. Thurston Aff. ¶ 23; Storm Dep. 42–45. When scheduling the January 16 meeting, Thurston and Holtz both also knew that plaintiff had very recently been hospitalized for a serious heart condition, was out on medical leave, and remained undiagnosed. Thurston Aff. ¶¶ 10, 14–15; Holtz Aff. ¶ 7, 12–13. While Thurston and Holtz claim that the only information they had about plaintiff's condition as of January 16, 2003 was that plaintiff had been cleared to return to work on January 28, the evidence in the record nevertheless allows an inference of knowledge or reason to know that calling plaintiff into the facility to fire him while he was out on medical leave with an undiagnosed medical condition was likely to cause plaintiff emotional distress, partic-

ularly given plaintiff's known history of anxiety attacks serious enough to necessitate leaving work, because plaintiff was at the time still on leave for a serious medical condition that no one knew the actual nature of.

■ As to the second element of extreme and outrageous conduct, however, there is insufficient evidence in the record to allow plaintiff to survive summary judgment on this claim. As noted above, this standard is a high one, requiring evidence supporting an inference that defendant's conduct went "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," rather than conduct "that is merely insulting or displays bad manners or results in hurt feelings." *Appleton,* 254 Conn. at 210–11, 757 A.2d 1059. The mere act of firing an employee does not provide a basis for an intentional infliction claim and, moreover, the Connecticut Supreme Court has stated that "individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace. There are few things more central to a person's life than a job, and the mere act of being demoted or denied advancement may be extremely distressing. That is simply an unavoidable part of being employed." *Perodeau v. City of Hartford,* 259 Conn. 729, 757, 792 A.2d 752 (Conn.2002).

Here, there is no evidence that plaintiff was informed of his termination in an unprofessional, embarrassing, or humiliating manner. Although the decision to call plaintiff into the facility while he was on medical leave, knowing of his history of anxiety attacks and recent hospitalization, may have reflected bad judgment and/or insensitivity resulting from defendant's impatience to carry out its planned job eliminations, it does not rise to the level which would lead a person of the community to characterize it as "outrageous!" Indeed, courts have dismissed intentional infliction claims where the conduct alleged/demonstrated by the evidence was significantly more offensive than that here. *See, e.g., Cox v. Keystone,* 861 F.2d 390, 395–96 (3d Cir.1988) (employee's termination on the day he returned to work after triple bypass surgery did not constitute extreme and outrageous conduct); *Miner v. Town of Cheshire,* 126 F.Supp.2d 184, 195, 198 (D.Conn.2000) (dismissing intentional infliction claim where plaintiff claimed defendant refused to take action to protect her from sexual harassment in the workplace and reprimanded her for asserting her right to be free from such harassment, finding "[i]n the absence of allegations of facts indicating that the Town conducted routine employment activities in a humiliating, extreme, or outrageous manner, the complaint does not state a claim for intentional infliction of emotional distress"); *Reed v. Signode Corp.,* 652 F.Supp. 129, 137 (D.Conn.1986) (defendant employer's denial of plaintiff's request for a leave of absence, even though plaintiff was undergoing treatment for cancer of the lymphoma, "hardly exceeds all bounds usually tolerated by decent society," and defendant's refusal to rehire plaintiff could not reasonably be regarded as "outrageous"); *Dollard v. Bd. of Educ. of the Town of Orange,* 63 Conn.App. 550, 552–53, 777 A.2d 714 (Conn.App.Ct.2001) (defendants' "concerted plan and effort to force the plaintiff to resign from her position or to become so distraught that they would have a colorable basis for terminating her employment" did not rise to intentional infliction level, even where "defendants carried out their plan by hypercritically examining every small detail of her professional and personal conduct," "transferred the plaintiff to a school where she did not want to be assigned and then secretly hired some-

one to replace her at the school from which she had been transferred," and "publicly admonished [her] for chewing gum, being habitually late, being disorganized and not using her time well [and] placed [her] under the intensive supervision of a friend of [one of plaintiff's supervisors]"); *Muniz v. Kravis*, 59 Conn.App. 704, 708, 757 A.2d 1207 (Conn.App.Ct.2000) (affirming grant of motion to strike intentional infliction claim where "plaintiff alleged that the defendants had sent an armed security guard to notify her and her husband of their termination of employment and had given them only twenty-four hours to leave [their apartment on premises of employer] . . . at a time when the plaintiff was on vacation and when her husband was recovering from a planned surgery").

Accordingly, even viewing the evidence in the light most favorable to the plaintiff, it is insufficient to permit a reasonable jury to find for plaintiff on his intentional infliction claim and thus defendant's motion as to this claim will be granted.

## B. Negligent Infliction of Emotional Distress

■■■ In order to recover on a claim of negligent infliction of emotional distress, the plaintiff must prove that: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (Conn. 2003).[2]A claim for negligent infliction of emotional distress "focuses on the manner of the discharge, whether the employer's conduct in the termination process was unreasonable, not whether the termination itself was unreasonable." *Cameron v. Saint Francis Hospital & Med. Ctr.*, 56 F.Supp.2d 235, 241 (D.Conn.1999) (internal citation omitted). "Recovery for unintentionally caused emotional distress does not depend on proof of either an ensuing phys-

2. Although defendant claims that " 'the elements of negligent and intentional infliction of emotional distress differ as to the state of mind of the actor and not to the conduct claimed to be extreme and outrageous,' " Def. Mem. at 34 (citing *Muniz v. Kravis*, 59 Conn. App. 704, 709, 757 A.2d 1207 (Conn.App.Ct. 2000)), as defendant acknowledges there is disagreement as to the appropriate standard for negligent infliction and more courts appear to adopt the more lenient standard of unreasonable conduct; indeed, the majority opinion in the recent Connecticut Supreme Court case of *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (Conn.2003), does not mention the higher negligent infliction standard urged by defendant. See *also Carrol*, 262 Conn. at 452, 862 A.2d 817 (Borden, J., concurring) ("[W]here the defendant's state of mind is purposefully to inflict emotional distress on the plaintiff, the plaintiff may not recover unless the defendant's conduct in pursuance of that intent is also extreme and outrageous; but where the defendant did not have such a malevolent state of

mind, but merely was negligent, the plaintiff may recover without having to prove that the conduct engaged in by the defendant was extreme and outrageous."); *Desardouin v. United Parcel Serv., Inc.*, 285 F.Supp.2d 153, 160–61 & n. 8 (D.Conn.2003) ("[U]nlike a claim for intentional infliction of emotional distress, the plaintiff need not show 'extreme and outrageous conduct' by the defendant in order to state a cause of action under negligent infliction of emotional distress.") (citing cases); *Copeland v. Home & Comm. Health Servs., Inc.*, 285 F.Supp.2d 144, 149–51 (D.Conn.2003) (finding *Muniz* "simply not controlling" on the basis that its higher standard for negligent infliction claims was "pure dicta" and "[m]ore importantly, a number of decisions from the Connecticut Supreme Court which have dealt with infliction claims both before and after *Muniz* have not required extreme and outrageous behavior for negligent infliction. Similarly, the bulk of lower court decisions have not required outrageous and extreme conduct with respect to claims for negligent infliction").

ical injury or a risk of harm from physical impact." *Id.* (citing *Montinieri v. S. New England Tel. Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (Conn.1978)).

■ The Court bears in mind the cautionary instruction of the Connecticut Supreme Court in its initial decision recognizing a cause of action for negligent infliction of emotional distress, that the cause of action should "be limited so as not to open up a wide vista of litigation in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law." *Montinieri*, 175 Conn. at 345, 398 A.2d 1180 (internal quotation and citation omitted). Thus, in the employment context, a tort of negligent infliction of emotional distress arises only where it is based on the unreasonable conduct of the defendant during the termination process. *See Parsons*, 243 Conn. at 88, 700 A.2d 655. "The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress." *Id.* at 88–89, 700 A.2d 655.

■ As to the first element—whether the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress—there is sufficient evidence in the record to support a jury's conclusion in the affirmative. First, there is evidence in the record that plaintiff was known by defendant to have suffered anxiety attacks which were significantly physically debilitating. Moreover, plaintiff had recently been hospitalized for a serious condition and remained undiagnosed. While as of January 14, 2003, plaintiff himself believed he could return to work on January 27, 2003, that was nearly two weeks into the future and at the time the January 16 meeting was called, plaintiff's doctor believed he should still be out of work on medical leave. Additionally, according to the testimony of plaintiff and his wife, Thurston and Holtz did not inform plaintiff that his termination effective date would be after plaintiff was released from medical care, and the documents provided stated an effective termination date of January 17 (the day after the meeting). Thus, there is evidence from which a jury could conclude that the manner in which defendant informed plaintiff of his termination—by calling him down to the office while he was still out on medical leave only three weeks after hospitalization, before the nature and severity of plaintiff's condition had been determined, and suggesting his termination would be effective the following day while he was still on leave—created an unreasonable risk that plaintiff would suffer distress beyond that typically suffered by an employee being terminated, including a potential anxiety attack or worsening of his undiagnosed condition.[3] *See Copeland v. Home & Cmty. Health Servs., Inc.*, 285 F.Supp.2d 144, 153 (D.Conn.2003) (denying motion to dismiss negligent infliction claim where plaintiff repeatedly advised her supervisor about the existence of and the nature of her health problems but despite awareness, her supervisor pressured plaintiff over a period of a month to return to work "by being inflexible about the date on which she was required to return to work and by threatening to hire,

---

**3.** Although the disputed fact that Thurston and Holtz originally intended to terminate plaintiff effective January 17 when he was still on medical leave alone cannot support his claim of conduct creating an unreasonable risk because, as noted above, the mere fact of a termination, even if wrongful or against company policy, is not sufficient by itself to sustain such a claim, *see Parsons*, 243 Conn. at 88, 700 A.2d 655, that fact, if proved at trial, could contribute to an inference of such conduct in light of the circumstances and context of plaintiff's termination as a whole.

and ultimately hiring, a replacement when the plaintiff did not return on this date"); *Edwards v. Cmty. Enters., Inc.*, 251 F.Supp.2d 1089, 1105–06 (D.Conn.2003) (where defendant knew that plaintiff was recovering from pneumonia when firing plaintiff and gave her just 48 hours to vacate her home, a reasonable jury could find that defendant "knew or should have known that its conduct involved an unreasonable risk of causing emotional distress and that such distress could result in illness or bodily injury," noting that plaintiff's claim "is based on the aggravating circumstances of the termination, not the mere fact that [plaintiff] was terminated").

As to the second element of foreseeable distress, as discussed above, Thurston was aware that plaintiff was subject to serious anxiety attacks and plaintiff also testified that Thurston knew he was seeing a psychiatrist. Storm Dep. at 23. Moreover, as of January 16, 2003, both Thurston and Holtz knew that plaintiff had been hospitalized only three weeks earlier due to a serious but undiagnosed condition and that plaintiff was out on medical leave at least until January 27. Further, plaintiff testified that on January 14 he informed either Thurston or Laverty that tests were still being conducted and about the possibility of a tumor. Storm Aff. ¶ 18. In fact, Thurston and Holtz had previously recognized a potential risk to plaintiff of going forward while plaintiff's condition remained uncertain—as of late-December or early-January, Thurston and Holtz agreed that they would not go forward with the position eliminations for the first week in January "[g]iven the uncertainty surround-

ing plaintiff's condition." Thurston Aff. ¶ 11; Holtz Aff. ¶ 7 ("Both Mr. Thurston and I agreed that it would be a mistake to go forward with eliminating the positions while plaintiff's status was unknown."). While ITW did receive a doctor's note on January 14 indicating a return-to-work date of January 27, thus suggesting plaintiff was on the mend, that was yet two weeks ahead and ITW had no other information regarding plaintiff's status at that time, nor had it requested any. Moreover, even after plaintiff arrived at the facility and was told his position was being eliminated, and even after he informed Thurston and Holtz that he was suffering from one of his "spells," they continued the meeting. Thus, there is sufficient evidence in the record to support a foreseeability inference.

As to the third element of distress severe enough that it might result in illness or bodily harm, plaintiff admitted at his deposition that the severe emotional distress he claims "was the fact that [he] had one of those spells" during the January 16 meeting, but that he suffered no other severe emotional distress, Storm Dep. at 107 ("Q. Was there any other severe emotional distress, other than what you experienced at that meeting? A. No."), and thus plaintiff's claim must be limited to that distress.[4] As to this distress, there is without question record evidence to support plaintiff's contention that the distress was severe enough to result in illness or bodily harm. Indeed, plaintiff testified that he had to sit down while having his "spell," Thurston and plaintiff testified that his spells necessitated him leaving

---

4. Plaintiff's admission is corroborated by his testimony that he did not seek medical attention following the meeting and by Dr. Mirabile's testimony and notes indicating that plaintiff appeared to be handling his termination well and that he did not adjust or increase plaintiff's medication or appointment schedule. Moreover, distress such as frustra-

tion or worry over lost wages, which both plaintiff and his wife testified to, does not constitute severe distress sufficient for a negligent infliction claim because those effects are natural incidents of termination, whereas negligent infliction claims focus on unreasonable conduct in the manner a termination is effected. *See Cameron, supra.*

work, and plaintiff's wife testified that plaintiff's spells had physical manifestations, including sweating, shaking, and nausea.

As to the last element—causation—defendant contends plaintiff cannot satisfy this element because plaintiff's spells were caused by his tumor, and not by defendant's conduct. However, notwithstanding that plaintiff agreed that his spells "were triggered by a condition within the body . . . that releases adrenaline . . . the tumor would release adrenaline," Storm Dep. at 107, there is evidence from which a jury could reasonably conclude that plaintiff's distress at the January 16, 2003 meeting was precipitated by the meeting itself and the manner in which it was being conducted. Specifically, plaintiff testified that he had been told by his doctors to "relax and keep [his] stress level down," id., which testimony supports an inference that stress could trigger a "spell." Plaintiff's testimony that "added stress . . . is what releases the norepinephrine, the upper adrenaline," id. at 109, also supports this inference.

Accordingly, there is sufficient evidence from which a jury could find for plaintiff on his negligent infliction claim as to the distress suffered by plaintiff at the January 16, 2003 meeting only. Defendant's motion as to this claim will therefore be denied.

## IV.  Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment [Doc. # 31] is GRANTED as to the intentional infliction of emotional distress claim and DENIED as to the negligent infliction of emotional distress claim.

IT IS SO ORDERED.