******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

C. ANDREW RILEY *v.* THE TRAVELERS HOME
AND MARINE INSURANCE COMPANY
(AC 37307)

DiPentima, C. J., and Sheldon and Bishop, Js.

*Argued January 19—officially released May 23, 2017*

(Appeal from Superior Court, judicial district of
Hartford, Complex Litigation Docket, D. Sheridan, J.)

*Linda L. Morkan*, with whom were *Daniel F. Sullivan* and, on the brief, *Jonathan E. Small*, for the appellant-cross appellee (defendant).

*Proloy K. Das*, with whom were *Kristen L. Zaehringer* and *Leonard M. Isaac*, and, on the brief, *Sarah Gruber* and *James J. Nugent*, for the appellee-cross appellant (plaintiff).

*Opinion*

SHELDON, J. In this case arising from a fire at the home of the plaintiff, C. Andrew Riley, both parties appeal from the judgment of the trial court awarding damages and prejudgment interest to the plaintiff against his homeowners insurer, the defendant, Travelers Home and Marine Insurance Company, upon the jury's verdict for the plaintiff on claims of breach of contract and negligent infliction of emotional distress. The defendant claims initially that the evidence adduced at trial was insufficient to support the jury's verdict in favor of the plaintiff on his claim of negligent infliction of emotional distress, and thus that the trial court erred in denying its motions for judgment notwithstanding the verdict, to set aside the verdict, and for remittitur. The defendant also claims that the court erred in allowing the plaintiff's two expert witnesses to testify over its objection at trial because one of those witnesses was not qualified to render an expert opinion in this case and neither witness had based his expert opinions on a scientifically reliable methodology. In his cross appeal, the plaintiff claims that the trial court abused its discretion in awarding him prejudgment interest pursuant to General Statutes § 37-3a at the rate of 3 percent instead of 10 percent. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On February 26, 2009, a fire destroyed a significant portion of the plaintiff's home in Pomfret, in which he and his wife, Barbara Riley, had been living and raising their children for more than twenty-five years. On the morning of the fire, the plaintiff was working on a project in a room on the first floor of his home when he received a telephone call from ADT Security Services, his home security service provider, notifying him that it had received an alert that there was a fire in his home. The plaintiff, initially in disbelief, immediately proceeded to the second floor of his home to look for the cause of the alert. Upon ascending the stairs, he saw flames through the open door of a room at the top of the stairs that was used as an office and exercise room, in which he had been exercising earlier that morning. Seeing that the room was engulfed in flames, he initially attempted to close the door but could not get it to stay closed. He thus took an old bathrobe from the adjacent bedroom and draped it over the door to keep it closed. In so doing, the plaintiff sustained a minor burn on his arm. Finally, after retrieving his wife's jewelry from their bedroom, the plaintiff ran back downstairs, confirmed with ADT that there was a fire in his home, and went outside to wait for assistance. Upon the arrival of multiple fire companies, the fire was promptly extinguished. As a result of the fire, the room in which the fire had occurred was essentially destroyed, along with most of its contents, including

all of the family's photograph albums, a Mother's Day card to Barbara Riley, a sonogram photo of one of their children, and an uncashed check in the amount of $30,000, which Barbara Riley had received as a work bonus. Although the fire was contained in that one room on the second floor, it caused extensive smoke damage throughout the plaintiff's home.

The town of Pomfret fire marshal, Adam Scheuritzel, arrived at the scene of the fire shortly after it was extinguished. He conducted an investigation of the cause and origin of the fire, using a video camera attached to his helmet to record his investigation. He also took several still photographs of the scene. In addition to inspecting the scene of the fire, Scheuritzel spoke to and obtained written statements from the plaintiff and several firefighters who had responded to the scene. Scheuritzel observed a kerosene heater and a separate container of kerosene in the exercise room where the fire had occurred, but he concluded that the kerosene had played no role in causing the fire. Scheuritzel concluded instead that the cause of the fire had been accidental, having been started by an electrical problem inside the wall of the exercise room.

The plaintiff immediately notified the defendant of the fire. The defendant, which had issued a homeowner's insurance policy containing standard provisions insuring the plaintiff's property for any loss due to fire, then initiated its own investigation of the cause and origin of the fire, and assigned one of its own employees, John E. Schoener, a trained and certified fire investigator, to conduct that investigation. Schoener concluded that "the fire originated in the vapors of an ignitable liquid (kerosene) that was poured throughout the floor area and on boxes of stored contents within the room of fire origin. All accidental causes were eliminated as a cause of this fire. The cause of this fire is classified as an incendiary fire."

By letter dated May 26, 2009, the defendant denied the plaintiff's claim for insurance coverage, stating that it had "concluded that [the plaintiff] intentionally caused the fire which resulted in this claim."[1] The defendant later sent another letter to the plaintiff, dated June 16, 2009, "to advise [him] of an additional basis for the denial of [his] claim." The letter stated, "During the investigation of this loss, [the plaintiff] concealed and/ or misrepresented material facts and circumstances concerning the loss and made material false statements relating to this loss and to his insurance coverage."[2] Although the defendant denied the plaintiff's claim, it accepted the claim of Barbara Riley for personal property of herself and other family members, and additional living expenses incurred while repairs were being made to the residence.

On October 18, 2011, the plaintiff initiated this action against the defendant, claiming breach of contract and

negligent infliction of emotional distress. In response, the defendant denied the plaintiff's claims and, by way of special defense, alleged, inter alia, that the plaintiff had intentionally caused the fire to his home and had "concealed or misrepresented material facts or circumstances, engaged in fraudulent conduct, and/or made materially false statements regarding the fire and insurance claim." The plaintiff denied the defendant's special defenses.

The case was tried to a jury in June, 2014. At the conclusion of the plaintiff's case-in-chief, the defendant orally moved for a directed verdict on the plaintiff's claim of negligent infliction of emotional distress. The trial court reserved judgment on that motion and proceeded with the trial. On June 23, 2014, the jury returned a verdict in favor of the plaintiff. By way of special interrogatories, the jury rejected the defendant's special defenses and found that the defendant had failed to prove that the plaintiff had intentionally caused the fire to his home or that he had "intentionally concealed or misrepresented material facts or circumstances, or engaged in fraudulent conduct, or made material false statements relating to his insurance . . . ." The jury found that the plaintiff had proved that the defendant breached his homeowner's insurance contract by denying his claim for coverage and refusing to pay for his losses from the February 26, 2009 fire, and that he had "sustained [damages] as a result of the [defendant's] negligent infliction of emotional distress . . . ." The jury awarded the plaintiff $504,346.10 in damages for breach of contract and $1,000,000 in damages for negligent infliction of emotional distress. The defendant thereafter filed motions for judgment notwithstanding the verdict, to set aside the verdict, and for remittitur. The court denied those motions and these appeals followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the evidence adduced at trial was insufficient to support the jury's verdict in favor of the plaintiff on his claim of negligent infliction of emotional distress. In support of that claim, the defendant argues (1) that the court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict on the ground that the court, in deciding both motions, was limited to the evidence adduced during the plaintiff's case-in-chief, which was insufficient to establish the plaintiff's claim; (2) that even if the trial court were not so limited, it should have set aside the verdict because the plaintiff failed to prove that he suffered severe emotional distress and that his emotional distress was proximately caused by conduct of the defendant in addition to its denial of his claim for coverage; and (3) that, in any event, the court should have granted its motion for remittitur because, "[g]iven the paucity of evidence of

emotional distress, the damage award shocks the conscience." We disagree.

On July 3, 2014, the defendant filed a motion for judgment notwithstanding the verdict, a motion to set aside the verdict, and a motion for remittitur. By way of memorandum of decision filed September 26, 2014, the trial court denied all of the defendant's postverdict motions. The defendant now challenges the denial of its postverdict motions on the ground that the evidence was insufficient to support the jury's verdict on the plaintiff's claim of the negligent infliction of emotional distress.

Our Supreme Court has stated "that directed verdicts are disfavored because [l]itigants have a constitutional right to have factual issues resolved by the jury. . . . Accordingly, [o]ur review of a trial court's [decision] to direct a verdict or to render a judgment notwithstanding the verdict takes place within carefully defined parameters. . . . [I]n reviewing the trial court's decision to render judgment notwithstanding the verdict, we may affirm that decision only if we find that the jury could not reasonably and legally have reached [its] conclusion. . . . The question is not whether we would have arrived at the same verdict, but whether, when viewed in the light most favorable to sustaining the verdict, the evidence supports the *jury's* determination. . . . A trial court may only grant a motion for judgment notwithstanding the verdict if the jury reasonably and legally could not have reached any other conclusion . . . and must deny such a motion where it is apparent that there was some evidence upon which the jury might reasonably reach [its] conclusion . . . . We review a trial court's decision on a motion for judgment notwithstanding the verdict for abuse of discretion." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 862–63, 124 A.3d 847 (2015).

Similarly, "[t]he standards governing our review of a sufficiency of evidence claim are well established and rigorous. . . . [I]t is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it. . . .

"We apply this familiar and deferential scope of review, however, in light of the equally familiar principle that the plaintiff must produce sufficient evidence to

remove the jury's function of examining inferences and finding facts from the realm of speculation. . . . A motion to set aside the verdict should be granted if the jury reasonably and legally could not have reached the determination that they did in fact reach." (Citations omitted; internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 442, 815 A.2d 119 (2003).

"[I]n order to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) Id., 446. In other words, "[t]o prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." (Internal quotation marks omitted.) *Grasso* v. *Connecticut Hospice, Inc.*, 138 Conn. App. 759, 771, 54 A.3d 221 (2012). With these principles in mind, we address the defendant's sufficiency arguments in turn.

A

In challenging the sufficiency of the evidence to support the jury's verdict in favor of the plaintiff on his claim of negligent infliction of emotional distress, the defendant first argues that the trial court erred in rejecting that challenge without limiting itself to considering the evidence adduced in the plaintiff's case-in-chief. We disagree.

The following additional procedural history is relevant to this claim. The plaintiff rested his case on June 10, 2014. Immediately thereafter, the defendant orally moved for a directed verdict on the plaintiff's claim for negligent infliction of emotional distress. The defendant argued in support of that motion that although the plaintiff's expert witness, Ronald R. Mullen, had testified as to the "standard of care" for conducting a fire investigation, no evidence was adduced as to any deficiency in its investigation of the fire, and thus the plaintiff had failed to establish a prima facie case of negligence in investigating his claim for insurance coverage, or, thus, negligent infliction of emotional distress. In response, the plaintiff pointed to the testimony of Scheuritzel and Mullen, who attested to their respective conclusions as to the accidental cause and origin of the fire in the plaintiff's home, as well as the defendant's attempts to influence and coerce his experts to change their reports and support its claim of arson. Without reference to specific portions of Mullen's testimony, the plaintiff argued that Mullen had, in fact, pointed to inadequacies in the defendant's investigation. Following that brief

argument by counsel, the court concluded: "[A]lthough I've expressed some concerns about the state of the pleadings and the evidence, it does seem to me there's sufficient evidence on this question, if not direct evidence, certainly reasonable inferences where I could reserve on that question pursuant to the Practice Book and we'll proceed to the defendant's case." The trial thus continued on to verdict, which, as previously noted, was returned in favor of the plaintiff.

In its motion for judgment notwithstanding the verdict, the defendant renewed its motion for a directed verdict. The defendant argued in that motion: "During his case-in-chief, [the] plaintiff failed to present any evidence (other than the letter denying his insurance claim) that would permit the jury to reasonably conclude that [the defendant] is liable to him for the negligent infliction of emotional distress. [The] plaintiff chose not to offer expert testimony regarding the integrity of [the defendant's] fire origin and cause investigation, or to call [the defendant's] employees who conducted the investigation to demonstrate their alleged unreasonable or egregious misconduct in the investigation of the fire." The defendant further argued: "[W]hile [the] plaintiff developed additional evidence regarding [the defendant's] conduct on cross-examination of [the defendant's] employees who testified on behalf of the defense, this evidence and testimony cannot be considered in evaluating whether [the] plaintiff met [his] burden in [his] case-in-chief and in reaching a determination on [the defendant's] motion."

Although not precisely argued before the trial court, the defendant's references to the plaintiff's "case-in-chief" can be construed to have raised its present claim that the court was confined to the evidence adduced during the plaintiff's case-in-chief when considering its motions for a directed verdict and for judgment notwithstanding the verdict. The law on this issue, however, is well settled.

"[W]hen a trial court denies a defendant's motion for a directed verdict at the close of the plaintiff's case, the defendant, by opting to introduce evidence in his or her own behalf, waives the right to appeal the trial court's ruling. . . . The rationale for this rule is that, by introducing evidence, the defendant undertakes a risk that the testimony of defense witnesses will fill an evidentiary gap in the [plaintiff's] case. . . . On appeal in such cases, the question becomes whether . . . there is evidence in *the entire record* to justify submitting the matter to a trier of fact. . . . Although we have questioned the continuing viability of the waiver rule in the criminal context . . . we have never questioned its applicability in the civil context." (Emphasis in original; internal quotation marks omitted.) *Elliott* v. *Larson*, 81 Conn. App. 468, 471–72, 840 A.2d 59 (2004). Our Supreme Court has explained the logic of this rule as

follows: "The waiver rule supports fact-finding and the ultimate truth seeking function of a trial . . . [because it] eliminates the bizarre result that could occur in its absence, namely, that a [judgment] could be reversed for evidentiary insufficiency, despite evidence in the record sufficiently establishing [liability]." (Citations omitted.) *State* v. *Perkins*, 271 Conn. 218, 237–38, 856 A.2d 917 (2004). To reach a contrary conclusion, the Court explained, would result in "a perception of the . . . trial as a sporting event in which the rules of the game trump the search for truth." Id., 245.

Here, because the defendant, after unsuccessfully moving for a directed verdict after the plaintiff rested, went on to present evidence on its claims that the plaintiff intentionally set fire to his house, engaged in fraudulent conduct and intentionally misrepresented or concealed material facts throughout the investigation as to the cause and origin of the fire, it is precluded by the waiver rule from claiming that the trial court was limited in its review of the sufficiency of the evidence to the evidence presented in the plaintiff's case-in-chief. Although the evidence presented by the defendant, which consisted almost exclusively of testimony of various employees of the defendant—evidence described by the defendant as "vitally important to [its] success on its special defenses"—had the effect of underscoring the inadequacies of its investigation of the fire, that was a risk the defendant assumed when it chose to present defense evidence at trial. Our case law, as quoted previously, makes it clear that the defendant is now bound by its choice to roll the proverbial dice by presenting its own evidence at trial. It therefore cannot claim error as to the trial court's prior denial, based solely upon the evidence presented in the plaintiff's case-in-chief, of its midtrial motion for a directed verdict.

B

The defendant next claims that the evidence adduced in the entire trial was insufficient to support the jury's verdict that the emotional distress allegedly suffered by the plaintiff was both proximately caused by the defendant and severe enough that it might have resulted in illness or bodily harm. We disagree.

In its motion to set aside the verdict and for a new trial, the defendant, inter alia, "expressly incorporate[d] th[e] arguments [set forth in the simultaneously filed motion for judgment notwithstanding the verdict]" and added that the plaintiff had also failed to present or elicit evidence of negligent infliction of emotional distress during the defendant's case. The defendant argued that, at most, the plaintiff had proved that the defendant had breached its contract with him, but that a denial of coverage was an insufficient basis for establishing a claim of negligent infliction of emotional distress.

In denying the defendant's motion for judgment not-

withstanding the verdict, the court reasoned: "Viewing the totality of the evidence in a light most favorable to sustaining the verdict, the court rejects the defendant's claim that the plaintiff did not prove any of the elements required for negligent infliction of emotional distress.

"There was sufficient evidence that the plaintiff's distress was reasonable in light of the defendant's conduct. The defendant conducted its investigation using its own employees to establish whether the fire that occurred at the plaintiff's residence was intentionally set. The defendant was required to conduct itself reasonably in conducting its investigation, since an accusation of arson insurance fraud would obviously have far-reaching personal, criminal and financial consequences for an innocent policyholder. That an innocent man falsely accused would suffer emotional distress is self-evident. The impact is aptly described in George Eliot's classic [1861] novel, Silas Marner, a tale of a man falsely accused of stealing, where it is observed that: 'deep are the sorrows that spring from false ideas for which no man is culpable.'

"The jury had evidence from which it could have concluded that, despite the town of Pomfret fire marshal's finding that the fire was accidental in origin, [the defendant's] principal fire investigator . . . Schoener, almost immediately suspected the plaintiff of having intentionally set the fire, and set out to prove his suspicion. This 'rush to judgment,' or working backward from a predetermined conclusion of arson rather than following the evidence to a logical conclusion, was a central theme of the plaintiff's case. The jury heard evidence, which, if believed, would have supported a determination that during the course of [the] investigation, Schoener 'fabricated' evidence to establish arson. Moreover, even without finding that evidence was intentionally fabricated, the jury could have reasonably inferred that the [the defendant's] investigation was plagued by 'confirmation bias'—the tendency to overly weigh evidence that agrees with one's preconceived notions and downgrade the importance of evidence that disagrees with one's preconceived notions.

"The jury heard evidence that Schoener contacted the town of Pomfret fire marshal and forcefully urged him to change his conclusion of an accidental fire and classify the fire as intentionally set. The jury also heard evidence that Schoener approached the plaintiff's fire investigator . . . Mullen, and through an 'interrogation technique' involving falsehood and subterfuge, attempted to acquire information about the plaintiff's investigation of the fire. The jury also heard that during that conversation with Mullen, Schoener denigrated the state of the plaintiff's marriage, believing that to be a possible motive for the arson. The jury could reasonably have inferred from these extraordinary efforts to disparage and harm the plaintiff—efforts which appeared to

be well outside the realm of a normal fire investigation—that (as [the] plaintiff's counsel argued) Schoener was 'out to get' the plaintiff and that a denial of coverage based on an accusation of arson—whether or not it was actually true—was the inevitable outcome of such a biased and flawed investigation.

"Finally, although he denied it, based on the evidence presented, the jury could have reasonably inferred that Schoener was motivated to find arson in order to advance his employment with the defendant.

"For these reasons, the court finds that there was sufficient evidence to support a finding that the defendant's conduct created an unreasonable risk of causing the plaintiff's emotional distress and that the plaintiff's distress was foreseeable.

"In addition, there was sufficient evidence that the plaintiff's distress was severe enough for the jury reasonably to conclude that it might result in illness or bodily harm. The jury heard testimony that when the plaintiff learned that coverage had been denied based on [the defendant's] conclusion that the fire had been intentionally set, he was 'shocked' and tremendously upset. The plaintiff's wife testified that the plaintiff's physical appearance reflected how much he had been staggered and taken aback: 'I remember thinking that the color of his face looked different, his skin color looked different.' Witnesses recounted the plaintiff's subsequent emotional state as he 'carried the burden' of a false accusation of arson, variously describing emotions of shame, embarrassment, unhappiness and depression. Witnesses also described behavioral changes in the plaintiff such as irritability and moodiness, and withdrawal from family and friends. From all [of] this testimony, the jury could have reasonably concluded that the long-term effect of this emotional turmoil might be physical illness or bodily harm.

"Finally, there was sufficient evidence from which the jury could find causation. The plaintiff's wife and daughter testified to a marked change in the plaintiff's moods, demeanor and behavior in the wake of the accusation of arson. The plaintiff himself testified to changes in the wake of the denial of coverage: 'I just plain pulled into a shell and, you know, I was—I spent a long time waiting for the state police to come and take me away.' "

On the basis of the foregoing findings, the court concluded that "there was sufficient evidence for the jury reasonably to have concluded as it did." The court thus denied the defendant's motion for judgment notwithstanding the verdict.

The court then turned to the defendant's motion to set aside the verdict. The court reasoned: "The defendant argues that the verdict for the plaintiff on the claim of negligent infliction of emotional distress is against the weight of the evidence because that evidence 'at most,

shows that [the defendant] breached the contract of insurance.' . . . The court disagrees. As has been discussed in the context of the motion for judgment notwithstanding the verdict, viewing all of the evidence in the light most favorable to sustaining the verdict, a jury could reasonably find that [the defendant's] conduct in investigating the plaintiff's claim was egregious and beyond the bounds of socially tolerable behavior.'' (Citation omitted.)

The court compared the facts of this case to those discussed by our Supreme Court in the earlier case of *Carrol* v. *Allstate Ins. Co.*, supra, 262 Conn. 444. The court explained: "In *Carrol* . . . under similar facts, our Supreme Court has upheld a finding of negligent infliction of emotional distress which arose when a homeowner's insurance company 'abused its right to investigate the origin of the fire at the plaintiff's house by conducting an investigation that was hasty, incomplete and ill-reasoned, thereby causing emotional distress to the plaintiff.' Id., 450. The emotional distress here sprang from unjustified accusations of dishonest, immoral and criminal activity and not merely from a breach of an obligation to pay . . . insurance proceeds. The defendant attempts to distinguish the *Carrol* decision because the jury in that case could reasonably have found that the fire investigation was 'tainted by racial animus'—and there is no such evidence in the present case. The court finds the distinction unavailing and the *Carrol* decision highly instructive as to the present motion.

"Although racial animus 'might have played a role' [id., 445] in the finding of arson [in *Carrol*], the court also suggested that the jury could have based its verdict on other factors that 'tainted' the investigation, such as the inference that the investigator 'was motivated to find arson in order to ensure his continued employment by the defendant.' [*Carrol* v. *Allstate Ins. Co.*, supra, 262 Conn.] 445. . . . In the present case, testimony was elicited regarding the defendant's employee and principal fire investigator . . . Schoener, and the possible influence of his findings in this case upon his continued employment, advancement, and training.

"Also, in a footnote, the *Carrol* court noted that the plaintiff's 'theme' [id., 440 n.9] throughout the trial was that the defendant impulsively concluded that the fire was caused by arson and never backed off this conclusion despite substantial evidence to the contrary. In the final argument in *Carrol*, [the] plaintiff's counsel suggested that the investigator 'concluded that this man tried to burn his house down. And, then he spent the rest of the time trying to make sure it could stick.' [Id., 449 n.11.] Similar arguments were made in the present case and the jury was asked to draw similar inferences from the conduct and statements of the defendant's principal investigator . . . Schoener. In the view of this

court, the similarities between *Carrol* and the present case are far more enlightening than the differences.

"Moreover, nowhere in *Carrol* is there a suggestion that a false accusation of arson can be considered 'egregious and beyond the bounds of socially tolerable behavior' *only* when it is motivated by racial prejudice. Regardless of the underlying motivation, any reasonable person would believe that falsely accusing an individual of the heinous crime of arson is abhorrent and reprehensible conduct." (Emphasis in original.)

The court thus found that "[t]here was sufficient evidence upon which the jury might reasonably have based its verdict in favor of the plaintiff" and, accordingly, denied the defendant's motion to set aside the verdict.

The defendant claims that the evidence adduced at trial was insufficient to support the jury's verdict that the defendant's conduct proximately caused the plaintiff to suffer emotional distress and that said emotional distress was sufficiently severe to establish negligent infliction of emotional distress.[3] The plaintiff concedes, as he must, that the defendant's denial of his claim for coverage, alone, would not have been legally sufficient to establish his claim of negligent infliction of emotional distress. See *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 341, 398 A.2d 1180 (1978) ("mere breach of the contract would not afford a basis for a recovery in tort" [internal quotation marks omitted]). It is clear from the trial record, however, that the plaintiff's claim for emotional distress was not based only upon the denial of his claim for coverage. Rather, the plaintiff's claim was also based upon the defendant's contemporaneous accusation that he had intentionally caused the fire in his own home, and thus committed the crime of arson.

The plaintiff testified, as more fully recounted herein, that he became obsessed with "clearing his name" and "withdrew" from his family, friends and community due to the shame that he experienced as a result of the defendant's accusation. He explained to the jury that he would lie awake at night wondering if the police were going to arrive and arrest him. The plaintiff further testified that the accusation of arson caused him to withdraw from a certain business venture so as to not impugn the business by its association with a person accused of committing an act so dishonest and criminal in nature as arson. The plaintiff's closing argument focused on the defendant's act of "label[ing] him a filthy word"—an arsonist—as the conduct that caused him to suffer severe emotional distress. We thus agree with the trial court's conclusion that "[t]he [plaintiff's] emotional distress sprang from unjustified accusations of dishonest, immoral and criminal activity and not merely from a breach of an obligation to pay . . . insurance proceeds." The defendant's claim that the evidence presented at trial was insufficient to prove that its conduct

proximately caused the plaintiff emotional distress is therefore unavailing.

We also agree with the trial court's determination that there was sufficient evidence that the plaintiff's emotional distress was "severe enough that it might result in illness or bodily harm . . . ." (Internal quotation marks omitted.) *Grasso* v. *Connecticut Hospice, Inc.*, supra, 138 Conn. App. 771. We are again guided by our Supreme Court's analysis in *Carrol,* where the plaintiff had suffered emotional distress similar to that suffered by the plaintiff here. In addressing the requirement that the emotional distress suffered by the plaintiff was severe enough that it might have resulted in illness or bodily harm, the *Carrol* court explained: "This court . . . in *Montinieri* v. *Southern New England Telephone Co.*, [supra, 175 Conn. 344], concluded that there is no logical reason for making a distinction, for purposes of determining liability, between those cases where the emotional distress results in bodily injury and those cases where there is emotional distress only. . . . The only requirement is that the distress *might* result in illness or bodily harm. The plaintiff testified that he could not sleep, had frequent nightmares, had a loss of appetite, and experienced depression and a sense of isolation from his community because of the investigation." (Citation omitted; internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, supra, 262 Conn. 448. On that basis, the court concluded that the emotional distress suffered by the plaintiff was severe enough that it might have resulted in illness or bodily harm. Id.

Here, the emotional distress suffered by the plaintiff was akin to that suffered by the plaintiff in *Carrol.*[4] Evidence was presented at trial regarding the impact that the defendant's accusation of arson had on him personally, on his relationships with his family and friends, and on his career. The testimony presented at trial revealed the emotional toll borne by the plaintiff upon being accused of intentionally setting his family's home on fire, and the frustration, humiliation and fear he experienced "every waking moment" for almost five years after being accused of a crime that he described as "despicable beyond belief." The emotions experienced by the plaintiff were consistent with those one might feel when falsely accused of intentional and criminal conduct. It cannot reasonably be argued that such distress was not so severe that it might have resulted in illness or bodily harm.

C

The defendant finally challenges the sufficiency of the evidence to support the amount of damages that the jury awarded to the plaintiff on his claim of negligent infliction of emotional distress. To reiterate, the defendant claims that the court improperly denied its motion for remittitur of the jury's $1,000,000 award on the ground that "[g]iven the paucity of evidence of emo-

tional distress, the damage award shocks the conscience." We disagree.

"Because an award of damages is a matter peculiarly within the province of the trier of facts, we have held consistently that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances. . . . In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. . . .

"Furthermore, [t]he decision whether to reduce a jury verdict because it is excessive as a matter of law . . . rests solely within the discretion of the trial court. . . . [Consequently], the proper standard of review of a trial court's decision to grant or deny a motion to set aside a verdict as excessive as a matter of law is that of abuse of discretion. . . . Accordingly, the ruling of the trial court on the motion to set aside the verdict as excessive is entitled to great weight and every reasonable presumption should be given in favor of its correctness." (Citations omitted; internal quotation marks omitted.) *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 705–706, 41 A.3d 1013 (2012).

In its motion for remittitur, the defendant argued, inter alia, that the amount of damages awarded by the jury on the plaintiff's claim for negligent infliction of emotional distress was "excessive as a matter of law" and was "grossly disproportionate to the harm suffered" by the plaintiff, which was "general and subjective." The trial court disagreed, reasoning, inter alia, as follows: "There was ample evidence before the jury that the plaintiff exhibited personality and behavior changes caused by emotional upset or anguish in the wake of [the] defendant's arson investigation. The plaintiff testified that over the four-plus years between the denial of coverage and the trial, he was beset by tumultuous emotions. 'There have been plenty of nights where, you know, you lie in bed and wonder, are the state police going to come to my door and take me away in handcuffs?' He withdrew from his family, friends and youngest son. As the plaintiff himself testified, he 'pulled

into a shell.' There was testimony that the plaintiff was at various times 'irritable' and 'brooding,' or 'downtrodden' and 'depressed.' The plaintiff (and others) testified that he 'put his life on hold' and became 'obsessed with clearing his name.' He felt compelled to forgo business opportunities and 'avoided' friends and acquaintances on account of the 'stigma' of having been accused of intentionally setting fire to his home for money. The testimony established that these were emotions, attitudes and behaviors not seen before in the plaintiff, who was typically good-natured, gregarious, confident and cheerful."

The court noted that although the award of damages was "remarkably generous," it could not find that it "fell outside the necessarily uncertain limits of fair and reasonable compensation." The court further found: "There is nothing in the record to suggest that the jury acted under the sway of passion or prejudice, or included items of damages that were contrary to the court's instructions or unsupported by proof. By all appearances, the members of the jury solemnly and diligently fulfilled their duty to weigh the evidence and render an award of damages that, based on their collective judgment, represented fair, just and reasonable compensation."

In denying the defendant's motion for remittitur, the court again referenced *Carrol*, which also involved emotional distress arising from a false allegation of arson. The court explained: "Determining the range of reasonable compensation for a given injury is never easy and cannot be reduced to a precise arithmetical calculation. However, as the parties have noted, this jury award of substantial emotional distress damages in connection with a denial of coverage for a fire loss is not entirely precedent setting. In *Carrol* v. *Allstate Ins. Co.*, [supra] 262 Conn. 437 . . . previously discussed, the jury awarded the plaintiff $500,000 as damages for emotional distress. On appeal, it was held that the court did not abuse its discretion in refusing to order a remittitur. The testimony in *Carrol* as to the impact upon the plaintiff of the false accusation of arson was not markedly dissimilar from the description of the plaintiff offered in this case. And the court takes judicial notice of the fact that $500,000 awarded in 2001 would, when adjusted for inflation using commonly accepted inflation calculators, be the equivalent of an approximately $675,000 award in 2014."

In light of the testimony regarding the emotional distress suffered by the plaintiff resulting from the unfounded allegations that he had set his own family's house on fire and engaged in fraudulent conduct to hide his allegedly intentional criminal conduct, distress that likely and logically would be experienced by anyone placed in that position, it cannot reasonably be argued that the jury's verdict was "plainly excessive or exorbi-

tant." (Internal quotation marks omitted.) *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 706. The testimony of the plaintiff himself and those close to him reveals that the defendant's allegations weighed heavily on him every day from the date that he received the first letter of denial from the defendant in 2009 to the date the jury returned its verdict. Although it is difficult to quantify emotional distress precisely, we agree with the trial court that the jury's award was well within the realm of fair and reasonable compensation.

## II

The defendant also claims that the court erred in denying its motion to preclude the plaintiff's disclosed experts, Scheuritzel and Mullen, from testifying on his behalf as to the cause and origin of the fire in the plaintiff's home. Specifically, the defendant claims that the proffered expert testimony should have been precluded pursuant to *State* v. *Porter*, 241 Conn. 57, 68–69, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), because Scheuritzel was not qualified to render an expert opinion and neither he nor Mullen "professed to follow a scientific methodology which satisfied the *Porter* standard." The defendant also argues that the court erred in failing to hold an evidentiary hearing on its motion to preclude. We disagree.

The following procedural history is relevant to this claim. On April 28, 2014, the defendant moved in limine to preclude the expert testimony of Scheuritzel and Mullen. The defendant argued therein: "Scheuritzel's purported opinion testimony should first be precluded because he is simply not qualified to testify as an expert witness on the origin and cause of the fire at issue in this case. Moreover, both . . . Scheuritzel's and . . . Mullen's opinions should be precluded because the methodologies underlying their scientific theories are not valid and therefore unreliable." In so arguing, the defendant noted that both of the plaintiff's expert witnesses had correctly "recognized [National Fire Protection Association standard 921 (standard 921)] as authoritative on the subject of the investigation of fires. . . . Investigations that comply with [standard] 921 are grounded in the scientific method, which is both desirable and necessary for accurate fire investigations."[5] (Citations omitted.) Scheuritzel and Mullen testified that they were trained in the guidelines set forth in standard 921 and generally adhered to those guidelines in conducting their respective investigations of the fire in the plaintiff's home. The defendant claimed, however, that neither witness, in fact, adhered to the methodology prescribed by standard 921. The defendant claimed that Scheuritzel, instead, based his investigation on his "vaguely generalized 'experience and training,' " and Mullen failed to thoroughly investigate any theories as to the cause of the fire beyond an electrical fault and

that he failed to consult an electrical consultant. On those bases, the defendant claimed that their testimony was unreliable and must be precluded.

On May 9, 2014, the court denied the defendant's motion to preclude. In so doing, the court recounted Scheuritzel's experience and qualifications and rejected the defendant's contention that he was not qualified to render an expert opinion. The court also rejected the defendant's claim that the testimony of the plaintiff's experts was not scientifically reliable. The court reasoned: "The methodology for the fire investigation conducted by Scheuritzel and Mullen appears to have been based in large part on their training and experience as fire marshals within the state of Connecticut, which would suggest that those techniques have gained some general acceptance. Nonetheless, the defendant argues that it must be excluded because Scheuritzel and Mullen failed to adhere to the methodology set forth in [standard] 921. There is no controlling appellate authority within this state as to whether [standard] 921 has so conclusively defined the field of fire investigation as to make any expert opinion based on a methodology other than [standard] 921 inherently unreliable or unscientific. Having reviewed excerpts from the depositions of Scheuritzel and Mullen, the court does not find their testimony to be based on any of the scientific insufficiencies—such as 'novel techniques' or 'conjecture or speculation'—that were identified in *State* v. *Porter* [supra, 241 Conn. 57] as being the hallmarks of expert testimony that does not meet the threshold of admissibility. . . . Excerpts from the depositions demonstrate that Scheuritzel and Mullen will no doubt be subjected to vigorous cross-examination as to how they came to reach their opinions. Their various departures from the [standard] 921 methodology for fire investigation will certainly be 'fodder for cross-examination' and will go to the weight, not the admissibility, of the expert testimony." (Citation omitted.)

Scheuritzel and Mullen were thus permitted to present expert testimony at trial regarding the origin and cause of the fire at the plaintiff's home. Here, Scheuritzel and Mullen acknowledged standard 921 as authoritative in the investigation of fires, and both testified that they had been trained in and adhered to the methodologies set forth therein. Both witnesses had extensive experience investigating fires and concluded that the fire had been accidental in nature and caused by an electric fault inside the wall of the exercise room on the second floor of the plaintiff's home. Upon arriving at the scene of the fire at the plaintiff's home, Scheuritzel, acting in his official capacity as chief fire marshal for the town of Pomfret, conducted a cause and origin investigation of the fire. Throughout his investigation and in reaching his conclusions as to the cause and origin of the fire, Scheuritzel employed and relied upon his twenty-three years of training and experience. The

camera on his helmet recorded his actions, and he took several still photographs of the scene. Scheuritzel spoke to and obtained written statements from the plaintiff and several firefighters who had responded at the scene, who provided various observations about the way the fire was burning, the color of the smoke, and the amount of time it took them to suppress the fire. Scheuritzel explained that he concluded that the fire originated inside the wall of the exercise room based upon his observation of V patterns and charring. Scheuritzel also testified that he observed beads of melted copper caused by an electric arc, which in turn was likely caused by a short circuit caused by rodent damage. He testified that he considered and eliminated other possible causes of the fire, and concluded that the fault of the electrical wiring in the wall was the cause. He observed the kerosene heater in the room and was aware that there had been a separate container of kerosene in the room during the fire, which had been spilled by the firefighters and moved to the bathtub. He eliminated the kerosene as a possible cause of the fire, however, because only the area near the heater smelled of kerosene and he noted no other evidence of accelerant during his investigation.

Mullen also employed and relied upon his training and experience, which dates back to 1981, throughout his investigation of the fire in this case. He went to the plaintiff's home to observe and investigate the fire scene himself. Although many items had been removed from the scene by the time of his arrival, he was able to inspect the floor and walls of the room where the fire occurred for evidence of incendiary fluids and burn patterns. He viewed the video recording of the scene from the day of the fire that was taken by the camera on Scheuritzel's helmet. He also read Scheuritzel's report, including the statements of the firefighters with whom Scheuritzel had spoken. Finally, he viewed many photographs that had been taken on the day of the fire. On the basis of his investigation, Mullen agreed with Scheuritzel that the fire at the plaintiff's home was accidental, having been caused by an electrical fault inside the wall of the exercise room. Mullen rejected the defendant's theory that the plaintiff had intentionally started the fire by dousing the room with kerosene because there simply was not enough damage to the room to support that theory. He further explained that he had observed no burn patterns on the floor that were consistent with the presence of an ignitable fluid.

In its motion to set aside the verdict, the defendant reiterated its argument that the testimony of Scheuritzel and Mullen should have been precluded because it was not scientifically reliable. The court disagreed, explaining: "[B]oth witnesses were subjected to vigorous cross-examination about their investigative methods, including the fact that, having recognized [standard] 921 as authoritative on the subject, both

experts' investigations were arguably not conducted in strict accordance with [standard] 921. Both experts were questioned about their failure to investigate the presence of kerosene in the room and their failure to examine or test the physical evidence before reaching their conclusions. Under a *Porter* standard, those alleged deviations from [standard] 921 methodology went to the weight, and not the admissibility, of the expert testimony." This appeal followed.

"We review a trial court's decision [regarding the admission of] expert testimony for an abuse of discretion. . . . We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision. . . . Although we afford trial courts significant discretion, [w]here it clearly appears that an expert witness is qualified to give an opinion, the exclusion of his testimony may be found to be [an abuse of discretion]. . . . To the extent the trial court makes factual findings to support its decision, we will accept those findings unless they are clearly improper. . . . If we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing party. . . .

"We also note our standards for admitting expert testimony. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [T]o render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Citations omitted; internal quotation marks omitted.) *Weaver* v. *McKnight*, 313 Conn. 393, 405–406, 97 A.3d 920 (2014).

Here, the trial court found that Scheuritzel was qualified to render expert testimony regarding the cause and origin of the fire at the plaintiff's home. Specifically, the court found that "[Scheuritzel] has been engaged in the firefighting and fire protection service in various localities in Connecticut in various capacities since 1987. He was awarded a fire marshal certificate by the state of Connecticut in 2003. As part of his training from [the] state of Connecticut for the fire marshal certification, he received training in investigations of fires and explosions. . . . Thereafter, from 2003 to 2011, he undertook thirty hours of . . . annual training and education for fire marshals. He has participated in (either as the principal investigator or as an assisting investigator) approximately thirty fire investigations. At the time of the fire which is the subject of this lawsuit, he was the chief fire marshal for the town of Pomfret.

He investigated this fire, spending two hours at [the] scene and making a determination as to where the fire originated." On those bases, the court found that Scheuritzel had a special skill or knowledge that is applicable to this case, was not common to the average person, and would assist the jury in reaching its verdict. The court's findings are supported by the record. We thus conclude that the court did not abuse its discretion in finding that Scheuritzel was qualified to provide expert testimony in this case.

"[B]eyond [the] . . . general requirements regarding the admissibility of expert testimony, [t]here is a further hurdle to the admissibility of expert testimony when that testimony is based on . . . scientific [evidence]. In those situations, the scientific evidence that forms the basis for the expert's opinion must undergo a [threshold] validity assessment [by the court] to ensure reliability. *State* v. *Porter*, [supra] 241 Conn. 68–69 . . . . In *Porter*, this court followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that scientific evidence should be subjected to a flexible test, with differing factors that are applied on a case-by-case basis, to determine the reliability of the scientific evidence. . . . *Porter* explicitly stated that the flexible *Daubert* approach was a better approach than the test of general acceptance in the scientific community, which was established in *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923). . . . Following *State* v. *Porter*, supra, 81–84, scientific evidence, and expert testimony based thereon, usually is to be evaluated under a threshold admissibility standard assessing the reliability of the methodology underlying the evidence and whether the evidence at issue is, in fact, derived from and based upon that methodology . . . .

"The mere fact that scientific evidence is sought to be admitted into evidence, however, does not require necessarily that a *Porter* inquiry be conducted as to the threshold admissibility of the evidence. As we have recognized, some scientific principles have become so well established that [a threshold admissibility] analysis is not necessary for admission of evidence thereunder. . . . Evidence derived from such principles would clearly withstand [such an] analysis, and thus may be admitted simply on a showing of relevance. . . .

"Moreover, certain types of evidence, although ostensibly rooted in scientific principles and presented by expert witnesses with scientific training, are not scientific for . . . purposes of our admissibility standard for scientific evidence, either before or after *Porter* [was decided]. . . . Thus, even evidence with its roots in scientific principles, which is within the comprehension of the average juror and which allows the jury to make its own conclusions based on its independent powers

of observation and physical comparison, and without heavy reliance upon the testimony of an expert witness, need not be considered scientific in nature for . . . purposes of evidentiary admissibility. . . . [E]vidence . . . which merely places a jury . . . in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge . . . is not the type of scientific evidence within the contemplation of *Porter*, and similarly was not within the ambit of our standard for assessing scientific evidence prior to *Porter*." (Citations omitted; internal quotation marks omitted.) *State* v. *West*, 274 Conn. 605, 630–31, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005).

"[Q]uestions about the methodological validity of proffered scientific testimony will generally go to the *weight* of such evidence, not to its admissibility. Courts should exclude scientific evidence, however, when such concerns render the technique, and the resulting evidence, incapable of assisting the fact finder in a sufficiently meaningful way. . . . Moreover, in light of the traditional policy regarding the admission of relevant evidence, [a] judge frequently should find an expert's methodology helpful [and thus admissible] even when the judge thinks that the expert's technique has flaws sufficient to render the [expert's] conclusions inaccurate. He or she will often still believe that hearing the expert's testimony and assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence. . . . A trial judge should therefore deem scientific evidence inadmissible only when the methodology underlying such evidence is sufficiently invalid to render the evidence incapable of helping the fact finder determine a fact in dispute." (Citation omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Porter*, supra, 241 Conn. 88–89. "Once the validity of a scientific principle has been satisfactorily established, any remaining questions regarding the manner in which that technique was *applied* in a particular case is generally an issue of fact that goes to weight, and not admissibility." (Emphasis in original.) Id., 88 n.31.

Here, the defendant argues, the plaintiff's "two experts agreed [as to] what constituted the standard methodology for fire investigation ([standard] 921), but disregarded that methodology and sought instead to testify as to their 'general experiences.' " "In large part, the focus of [the defendant's] objections to [the] plaintiff's experts was that they were tainted by expectation bias, examining only that evidence that supported their assertion that the fire was electrical in origin." The defendant argues: "[D]espite their acknowledgement of the authoritative nature of [standard] 921, neither

Scheuritzel nor Mullen testified that he had followed its protocols. Neither man had even looked at all of the evidence. Mullen, a latecomer to the investigation, had not even examined the wire that was said to have been the source of the electrical fault . . . nor did he look at the kerosene container and cap collected from the scene. . . . [The defendant] was especially concerned with the introduction of expectation bias in the investigations conducted by these two individuals because their testimony revealed that they both heeded only that evidence that supported the theory of an electrical fault, and had not adequately addressed or even considered other possible causes of the fire. By refusing to consider evidence which might lead to an alternative conclusion, neither Scheuritzel nor Mullen conducted a systematic and scientific investigation of the fire scene. Their failure to comply with even the most basic tenets of a scientific methodology (including the performance of a full and complete investigation) illustrates the concerns [the defendant] had in having their opinions offered to the jury as expert opinions." The defendant argues, "[b]ecause neither of [the] plaintiff's proposed witnesses considered all of the evidence or relied on any recognized or reliable method in determining that the fire was caused by an electrical fault, their proposed testimony did not meet the *Porter* standard." (Citations omitted; footnote omitted; internal quotation marks omitted.)

In other words, the defendant challenges the admissibility of the expert testimony, as it did at trial, on the ground that the plaintiff's expert witnesses did not adhere to the methodology set forth in standard 921, which both witnesses recognized as authoritative. The defendant does not attack the scientific basis for the expert testimony, but, rather, argues that they did not adhere to that science—that they did not follow the recognized scientific methods set forth in standard 921. This is the precise circumstance contemplated by the *Porter* court when it instructed that "questions regarding the manner in which [a scientific] technique was applied . . . [are] generally an issue of fact that goes to weight, and not admissibility." (Emphasis omitted.) *State* v. *Porter*, supra, 241 Conn. 88 n.31. The defendant's assertion that investigations conducted by Scheuritzel and Mullen were not thorough and that they did not do all that could or should have been done goes to the weight of their testimony, not its admissibility.[6] Because the defendant did not, in fact, attack the scientific reliability of the witnesses' testimony, the court did not abuse its discretion in admitting that testimony into evidence without a *Porter* hearing.

### III

The plaintiff cross appeals from the judgment of the trial court on the ground that the court improperly awarded prejudgment interest, on the breach of con-

tract award rendered by the jury, at the rate of 3 percent instead of 10 percent, which he requested pursuant to § 37-3a. We disagree.

On July 2, 2014, the plaintiff filed a motion for prejudgment interest on the $504,360.10 awarded by the jury on his breach of contract claim. Pursuant to § 37-3a, the plaintiff sought prejudgment interest at the rate of 10 percent per year beginning on May 26, 2009, the date that the defendant notified the plaintiff of its denial of his claim. The defendant objected to the plaintiff's motion, arguing, inter alia, that § 37-3a sets the maximum rate at which prejudgment interest may be allowed at 10 percent, but that an award for prejudgment interest should be consistent with lower rates that had been prevalent during the period of time in which the moneys were allegedly wrongfully withheld from the plaintiff.

On September 26, 2014, the court granted the plaintiff's motion for prejudgment interest, finding that although "an award of interest is not a matter of right . . . [based upon] the evidence presented at trial and the jury's verdict, the court believes that it is warranted in the present case. [The defendant] elected to base its decision to refuse payment on an in-house investigation and analysis, rather than an independent and impartial inquiry. All of the collecting, analyzing, and interpreting of evidence was performed by [the defendant's] employees, arguably skewing the results against the insured, and in favor of arson. In the end, the analysis hardly proved to a scientific certainty, much less a preponderance of the evidence, that the fire was intentional, rather than accidental in origin. Yet, it was the basis for [the defendant's] business decision that it was relieved of its contractual obligation to pay the claim of its insured. This is not a breach of contract as a result of an honest mistake or a good faith misunderstanding. It is in the interests of justice to award interest for the detention of money under such circumstances."

As to the rate of interest awarded, the court explained: "[T]he court agrees that an award of interest at the statutory maximum rate of 10 percent would be inequitable in the present case. As with all damages, the award of interest is not intended to punish the defendant; it is meant to compensate the plaintiff for the loss of the use of his money. It is commonly recognized that, in the wake of the 2008 financial crisis and recession, interest rates for borrowing or investing money were at historic lows for several years. The [p]laintiff himself is aware of this, as he testified to it during the trial. The plaintiff's loss of the use of his money occurred during this period, and any interest award must take into account the economic conditions in effect at that time. . . .

"Considering all of the above, under the particular facts and circumstances of this case, the court finds that prejudgment interest at a rate of 3 percent . . .

per annum commencing on May 26, 2009, is appropriate to compensate the plaintiff for the loss of use of his money."

The plaintiff now challenges the interest rate utilized by the trial court in awarding him prejudgment interest, arguing that the court improperly awarded prejudgment interest at the rate of 3 percent instead of the "presumptive statutory rate" of 10 percent. The plaintiff claims that the court improperly placed the burden on him to prove his entitlement to the 10 percent interest rate and that the court "established an arbitrary range, unconnected to the facts and circumstances of the case currently before it, outside of which it would not stray . . . ." We disagree.

Section 37-3a (a) provides in relevant part that "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable."

"The decision of whether to grant interest under § 37-3a is primarily an equitable determination and a matter lying within the discretion of the trial court. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . The purpose of § 37-3a is to compensate plaintiffs who have been deprived of the use of money wrongfully withheld by defendants. . . . Whether interest may be awarded depends on whether the money involved is payable . . . and whether the detention of the money is or is not wrongful under the circumstances." (Citations omitted; internal quotation marks omitted.) *Hartford Steam Boiler Inspection & Ins. Co.* v. *Underwriters at Lloyd's & Cos. Collective*, 121 Conn. App. 31, 61, 994 A.2d 262, cert. denied, 297 Conn. 918, 996 A.2d 277 (2010).

Here, in moving for prejudgment interest pursuant to § 37-3a, the plaintiff baldly claimed that it was entitled to interest at the rate of 10 percent per annum. The plaintiff presented no legal argument or analysis to the trial court in support of its claim of entitlement to interest at the rate of 10 percent.[7] The plaintiff now claims that he was entitled to interest at the rate of 10 percent because it is the "presumptive statutory rate" of interest to which he is entitled under § 37-3a. Our Supreme Court has explained: "[Section] 37-3a (a) provides for a *maximum* rate of interest of 10 percent, with discretion afforded to the trial court to order interest at a lesser rate. . . . [U]nder § 37-3a (a), an interest rate of less than 10 percent is presumptively valid, and therefore will be upheld, unless the party challenging the rate set by the court can demonstrate that it represents an abuse of discretion." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Ballou* v. *Law Offices Howard Lee Schiff, P.C.*, 304 Conn. 348, 365,

39 A.3d 1075 (2012).

In granting the award for prejudgment interest, the court relied heavily on the fact that the interest rates during the period of time that the funds were wrongfully detained from the plaintiff were lower than the 10 percent allowed under § 37-3a. The court explained that it "surveyed representative decisions of Superior Court [cases] in the first six months of 2014 and found that, with rare exceptions, most [courts] found that interest in the range of 3 to 6 percent per annum appropriately compensates a plaintiff for deprivation of the use of his or her money." The court clarified: "Obviously the appropriate exercise of legal discretion requires that each case be considered on its own merits. The object of a survey of other Superior Court decisions is not to suggest that an appropriate interest rate is the average of all interest rates employed by other judges. Rather it helps by giving an approximation of the upper and lower limits of the range within which—absent extraordinary circumstances—the court should exercise its discretion." With those other cases in mind, the court considered the "particular facts and circumstances of this case" and determined that interest at the rate of 3 percent was appropriate to compensate the plaintiff for the loss of use of his money. It is clear from the foregoing that the trial court carefully considered the facts and circumstances before it, together with the prevalent interest rates during the time period within which the plaintiff was deprived of his funds. We thus conclude that the court acted well within its discretion in awarding prejudgment interest at the rate of 3 percent.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In that letter, the defendant cited to the following provision of the plaintiff's insurance policy:

"SECTION I—EXCLUSIONS

"8. Intentional Loss

"We do not provide coverage for the 'insured' who commits or conspires to commit an act with the intent to cause a loss."

[2] The letter directed the plaintiff to the "Special Provisions—Connecticut Endorsement (HO-300 CT (08-07)):

"8. CONCEALMENT OR FRAUD

"We will not provide coverage for the 'insured' who, whether before or after a loss has intentionally:

"a. Concealed or misrepresented any material fact or circumstance;

"b. Engaged in fraudulent conduct; or

"c. Made material false statements relating to this insurance."

[3] The trial court comprehensively set forth the basis upon which the jury could have determined that the defendant's investigation—the investigation that led to its conclusion and ensuing allegation that the plaintiff committed arson—was, at best, incompetent. The defendant has not challenged the trial court's factual findings regarding its conduct. In fact, the defendant so concedes in its reply brief to this court, wherein it stated that it "has not appealed on the basis that it did not act tortiously." From Schoener's rush to judgment that the plaintiff had started the fire at his home, his removal of evidence from the plaintiff's home without providing notice that he was doing so, to the indifference with which he regarded fundamental principles of investigations, such as the contamination of evidence and the chain of custody, the incompetence of the defendant's investigation cannot reasonably be disputed. Upon being assigned the investigation, Schoener enlisted the assistance of John E. Sleights, another employee of the defendant who

shared his cavalier approach to maintaining the integrity of their investigation. One of the most egregious examples of deficiency of the defendant's investigation was its handling of the kerosene container that had been near the kerosene heater in the exercise room at the time of the fire—the very container from which the plaintiff allegedly poured kerosene throughout the exercise room to start the fire. On February 27, 2009, the day after the fire, Schoener noticed the container in the bathroom adjacent to the exercise room, where it had been placed in the bathtub by one of the firefighters. Rather than take that container into evidence at that time, Schoener, along with the plaintiff and his public adjuster, placed the container in a wheelbarrow in the plaintiff's barn, where it remained, open and uncovered, over the following weekend. Schoener eventually put the container in the back of his pickup truck, where he allegedly took samples of the liquid contained in it on March 3, 2009. (It is noteworthy that the plaintiff testified that he had, in fact, emptied the kerosene container on February 27, 2009.) The evidence tag affixed to that container, presumably a key piece of evidence to the defendant's steadfast position that the plaintiff had used it to douse the exercise room with kerosene to start the fire, was completed by Sleights. The information on that tag, which was filled out by Sleights, is inaccurate. According to the tag, the container was seized by Sleights on February 27, 2009 from the second floor bathroom. The February 27, 2009 date actually appears in the field allotted for "Time." There is no indication as to what time it was collected. Sleights testified that his first involvement in the case, consistent with his personal notes, was not until March 3, 2009. In fact, Sleights conceded at trial that he had never seen the blue kerosene container outside of the defendant's laboratory prior to June, 2014. He never saw it at the plaintiff's home.

Mullen testified that the proper protocol when an investigator finds a container that contains a substance that may have caused the fire would be to take it into custody immediately and properly document it. None of the defendant's witnesses ever provided a clear explanation as to why this simple, yet paramount, protocol was not followed. The incompetence surrounding the handling of this container is baffling. Compounding the obvious deficiency with the procedures employed by the defendant throughout its investigation of the origin and cause of the fire at the plaintiff's home is the fact that the testimony of Schoener and Sleights continues to change each time it is presented.

John Machnicki, the "vice president in charge of [the defendant's] forensic consulting and analytical laboratories," confirmed that he had learned that Schoener "had not made proper documentation for what he had done at the scene of the Riley home . . . ." The defendant's laboratory technician, Christine Lopol, testified that this was the first investigation in her twenty-two year career with the defendant in which she did not have complete chain of custody documentation for samples provided to her in an investigation.

The previously described conduct is but one example of the problematic nature of the defendant's investigation. From that investigation, which was knowingly marred by a lack of integrity, came the defendant's unwavering accusation that the plaintiff had intentionally started the fire to his home.

[4] In considering the severity of the distress suffered by the plaintiff, the court referred to the evidence that it considered in denying the defendant's motion for remittitur, which will be more specifically set forth herein.

[5] "In response to increased judicial demands for a better showing of the reliability of scientific and technical experts, the National Fire Protection Association (NFPA) has formulated guidelines for fire scene investigations. NFPA 921 outlines a thorough basis for conducting a fire investigation. NFPA [921] has become the de facto national standard for fire scene examination and analysis." (Footnotes omitted; internal quotation marks omitted.) P. Giannelli et al., Scientific Evidence (5th Ed. 2012) § 26.03, pp. 1053–55.

[6] Although not binding on this court, we note that other jurisdictions have also held that an expert witness' alleged failure to strictly adhere to the guidelines set forth in standard 921 goes to the weight of the testimony of that expert, not its admissibility. See, e.g., *Schlesinger* v. *United States*, 898 F. Supp. 2d 489, 505 (E.D.N.Y. 2012) ("The decision not to follow the methodology set forth in NFPA 921, as well as other purported flaws in the . . . methodology—*e.g.*, the failure to rule out other possible causes—goes to the weight of the evidence, not its admissibility. See *Allstate Ins. Co.* v. *Gonyo*, No. 07-CV-1011, 2009 WL 1212481, *6 [N.D.N.Y. April 30, 2009] [denying *Daubert* challenge to an arson expert who [had] not 'ardently and strictly followed each step of NFPA' and holding that '[i]f there is any question that [the arson expert] did not eliminate every cause for the fire, this will not be determinative as to whether he will testify; all that it suggests is that the

credibility of his decision may be subject to an attack.']; *Pekarek* [v. *Sunbeam Products, Inc.*, 672 F. Supp. 2d 1161, 1175–76 (D. Kan. 2008)] [the mere fact that the expert did not 'cite or use NFPA 921 as his guide does not necessarily mean he failed to use a reliable method' and although he did not note and document all items that may have been potential causes of the fire 'such deficiencies, while grounds for cross-examination, are not sufficient to preclude a jury from hearing and considering his opinion testimony as to the point of origin or his opinion ruling out specific items such as the breaker panel and the candle [although not the attempt to light it] as possible causes of the fire']").

[7] The plaintiff did not argue to the trial court that he was entitled to interest at the rate of 10 percent on the ground that it was the "presumptive statutory rate." Consequently, the trial court was not afforded the opportunity to consider the merits of that argument.

———————————————